**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert I. FALK, Defendant-Appellant.**

**No. 78–2299.**

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1979.

Decided Sept. 11, 1979.

Rehearing and Rehearing In Banc Denied Oct. 17, 1979.

---

**13.** Offhand it would seem to us that either Fed.R.Civ.P. 22 or more likely 28 U.S.C. § 1335 would have been available to the bank.

David P. Schippers, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., David B. Atkins, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT and TONE, Circuit Judges, and JAMESON, Senior District Judge.*

JAMESON, Senior District Judge.

Appellant, Robert I. Falk, was convicted, following a jury trial, of filing and subscribing to a false and fraudulent income tax return (Form 1040) for the calendar year 1973 by knowingly and wilfully understating his gross income, in violation of 26 U.S.C. § 7206(1).[1] On appeal he contends that (1) the manner in which the Government handled the case from investigation through trial denied him due process of law and a fair trial by reason of (a) preindictment delay and (b) conduct of Government attorneys in presenting their case and cross-examining the defendant; (2) the final argument of Government counsel was so inflammatory and prejudicial as to amount to denial of due process; and (3) the testimony of a revenue agent should have been stricken for failure to provide a statement of the witness pursuant to 18 U.S.C. § 3500.

### Factual Background

Falk, a mechanical engineer, was employed by McKee-Berger-Mansueto Company in Chicago as manager of its estimating department between 1969 and April, 1975, when he accepted a position with Hospital Affiliates, in Nashville, Tennessee. In 1972 Falk's employer was involved in scheduling various types of work for the Chicago City Hall. J. P. Phillips Co. was a plastering contractor. In July or August Phillips engaged Falk as a consultant. During 1973 Falk received two checks from Phillips, one for $7,000 and one for $3,000, for services from August, 1972 through 1973.

At Falk's request both checks were made payable to Beverly Bank. Approximately 20 days before the first check was received, Falk reopened an account in Beverly Bank in the name of Arm Industries, a partnership composed of Falk and David Povilaitis, by signing both his own name and that of his former partner on a new signature card. Both checks, when received, were deposited in the Arm Industries account. Shortly thereafter Falk drew checks on the partnership account and put the receipts in his personal account.[2] Falk did not include the $10,000 received from Phillips in his 1973 tax return, which was filed on March 30, 1974, shortly before Falk moved to Nashville.

In August, 1974, during an audit of J. P. Phillips Company, Revenue Agent Friedman questioned the two checks payable to Beverly Bank. Phillips explained that the checks had been given to Falk in payment of a consulting fee. At Friedman's request, Phillips called Falk, who in turn called Friedman. Falk admitted to Friedman that he had received the two checks.[3] At Phillips' request Falk sent Phillips receipts for the five checks payable to Beverly Bank and initialed the receipts "H.I.B.".[4]

In October, 1974, Friedman met with Special Agent Starr, and a criminal investi-

---

* The Honorable William J. Jameson, Senior District Judge of the United States District Court for the District of Montana, is sitting by designation.

1. Falk was sentenced to imprisonment for one year and fined $5,000 payable within one year, with the execution of the prison sentence suspended and the defendant placed on probation for two years, on condition that he pay any fraud penalties assessed by the Internal Revenue Service in addition to the $5,000 fine.

2. During 1974 three additional checks—one for $5,000 and two for $500 each—were handled in the same manner. None of the checks bore Falk's endorsement.

3. Friedman testified at trial that Falk told him in this conversation that Falk had netted only approximately $2,000 because he had other expenses, including an employee by the name of Bob O'Brien working for him. Falk testified that Friedman asked whether Falk had received $16,000 from Phillips, and Falk replied that he had. He recalled Friedman asking whether he knew anyone else who worked for Phillips, but denied telling Friedman that a Bob O'Brien worked for Falk. He also denied having told Friedman that he netted only $2,000.

4. At trial Falk testified on cross-examination that when he furnished the receipts to Phillips he was thinking of going back to Chicago to his old company, and he did not want to be identified with his outside consulting business.

gation was started. In December, 1974, Starr met with Falk in Falk's office in Nashville, Tennessee. Starr first explained his function as a special agent and advised Falk of his constitutional rights.[5] During an hour and a half interview, Falk admitted receiving and depositing the two checks and failing to include the $10,000 in his 1973 return.[6]

During the interview Falk requested advice from Starr on how he should handle the money received from Phillips on his tax return. Starr replied that he was not in a position to give Falk advice. The following day Falk obtained a form and instructions from the Internal Revenue Service and filed an amended return shortly thereafter. Because of an error in the amended return, a second amended return was filed later.

Between December 30, 1974, and November, 1975, Starr called Falk several times requesting additional information and documents. All were furnished by Falk. In March or April, 1978, Falk was told by Starr that he had been indicted.

### Evidence at Trial

At trial the Government's case was presented through numerous documents and the testimony of Agents Friedman, Starr and Duffy, John P. Phillips, Phillip J. Phillips, David Povilaitis, and an employee of Beverly Bank. Falk testified in his own behalf.

In explaining the issuance of the checks to Beverly Bank Falk testified that he did not want his employer to know that he "was moonlighting, or, you know, having another business on the side"; that about that time two good friends, who were employed by the same company and had been consulting evenings and weekends and had their own business, were relieved of their duties. With specific reference to the issuance of the checks, Falk continued:

A. Well, at the time John (Phillips) and I had a discussion about, I did not want myself associated with any firm or any, you know, receipts as far as the—to show that I was working for someone else. And we discussed on just how, you know, it should be done how to, you know, to keep my name out of it and I had a company that I had before, it was just a small company that made propellers and that never really went over and I was using—I was thinking of using that company and we discussed it and finally we just mutually agreed, you know, we could make them out to the Beverly Bank.[7]

(From direct examination, Tr. 166–67).

In explanation of his omission from his 1973 return of the monies received from Phillips, Falk testified:

As far as my '73 return, it is, you know, correct, except the monies from Phillips which were in the Arm Industries account. At the time I was looking at the Arm Industries account I had a real problem of how to file it. I didn't know how to file it, that was one real problem, and I looked at starting a company as far as my own consulting business and as far as a company or a corporation having a different year end filing, I looked at that

5. Appellant does not dispute Starr's testimony that in this interview he first read from a card stating that as a special agent one of his functions was to investigate the possibility of criminal violations of the Internal Revenue law and from another card advising Falk of his constitutional rights. Appellant does argue, however, that Falk was not again advised of his rights in the subsequent telephone interviews.

6. Starr testified that Falk stated that he did not report the income received from Phillips because he did not know how it should be reported; that he had received no W–2 or Form 1099; that he was to be paid "$8.00 per hour tax free", later changed to $8.00 net after withhold-

ing. Starr testified further that Falk stated the payment to the Beverly Bank was on Mr. Phillips' "volition" and that he had not endorsed the checks because they were not payable to him. Falk denied telling Friedman he kept only $2,000.

7. John Phillips testified that he was told by Falk to make the checks payable to Beverly Bank, that he had never heard of the bank, that he had never heard of or had any dealings with Arm Industries, and that he never had any discussion with Falk about withholding taxes and did not have Falk's social security number.

because I received the funds that I received from that business from June of '73 to like April of '74 and so I was looking at the year end.

I also had the problem that I worked in 1972 and I never got paid in 1972 and also my work in 1973, I never got fully reimbursed for what I worked. I was only paid partially. And I was trying to figure out, how do I take the deductions or the itemized deductions for '72 and how do I combine that with 1973 and how does that affect me in 1974 and I heard something about income averaging where if you had, you know, higher income, a football star or something like that, you know, and they had made a high income, was on TV or something like that, that you could, you know, that you could income average.

I looked at, you know, I could combine '72, '73, '74 for Arm Industries or, you know, a corporate account. I looked at it also that I could file it in 1974, because there was no cutoff line for what I had made in 1973 and I was very confused. I didn't know how to do it. I considered that I had time to do it, that I could file it in my '74 return, I could file it, I could file it as a separate company, and—

(From direct examination, Tr. 174–75).
The jury obviously did not accept Falk's explanation of the reason for having the checks made payable to the Beverly Bank and failing to report receipt of the $10,000 in his 1973 income tax return.

### Pre-Indictment Delay

Appellant first contends that the pre-indictment delay amounted to a denial of due process and his right to a fair trial. Falk was first interviewed by Agent Friedman in August, 1974. The criminal investigation began in December, 1974, and was completed in November, 1975, when Special Agent Starr recommended prosecution. The indictment was returned in April, 1978.

Appellant argues that "virtually every element of the resultant indictment" had been developed by Friedman and that the

subsequent delay of 40 months resulted in "obvious prejudicial effects"—dulled memories, ability to reconstruct events and records lessened, and witnesses and supporting documents having disappeared or otherwise become unavailable. He contends further that he "was deliberately lulled and misled by agents into the erroneous belief that he had only to provide information and all would be well."

■ At the outset it is noted that the issue of pre-indictment delay was first raised on appeal. It was not asserted in any pretrial motion, during trial, or in the motion for a new trial. It is well settled that as a general rule issues not raised in the district court will not be considered on appeal in the absence of plain error. *See, e. g., United States v. Lookretis*, 422 F.2d 647, 651 (7th Cir.), *cert. denied*, 398 U.S. 904, 90 S.Ct. 1693, 26 L.Ed.2d 63 (1970); *United States v. Turner*, 423 F.2d 481, 483 (7th Cir.), *cert. denied*, 398 U.S. 967, 90 S.Ct. 2183, 26 L.Ed.2d 552 (1970); Rule 52(b) F.R.Crim.P. The facts in this case do not bring the pre-indictment delay within any recognized exception to the general rule.

In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1970), in concluding that a 38 month pre-indictment delay did not deprive the accused of rights to due process of law and a speedy trial, the Court held the Sixth Amendment guarantee of a speedy trial is applicable only after a person has been "accused" of a crime, and that the relevant statute of limitations provides a safeguard against possible prejudice resulting from preaccusation delay. With reference to a claim that the Government violated the Due Process Clause, the Court said:

No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limi-

tations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment.

*Id.* at 326, 92 S.Ct. at 466.

Appellant's suggestion that the delay here was solely for the purpose of giving the Government a tactical advantage over the defendant is not supported by the record.[8] Since this question was not raised in the district court there was, of course, no reason for the Government to offer any explanation of the delay.

### Cross-Examination of Falk

■ Falk admitted receipt of the $10,000 and his failure to report it in his 1973 income tax return. He claimed, however, that he had no intention to violate the law, and the $10,000 was not included in his 1973 return because he did not know how to report it.

Falk was charged with the violation of 26 U.S.C. § 7206–1, which provides:

Any person who—

. . . Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; . . .

shall be guilty of a felony . . . .

The district court properly and carefully instructed the jury that before the defendant could be found guilty the prosecution must prove beyond a reasonable doubt that he "intentionally committed the Act"—that it was done wilfully and knowingly.[9]

To establish the necessary proof that Falk acted wilfully and knowingly, the Government relied in part upon Falk's tax returns for 1969, 1970, 1971, 1972 and 1974 to show that he was "sophisticated" and detailed in the preparation of those returns. The Government argues that it was "crucial for the government to establish that Falk personally knew how to prepare and did in fact prepare complicated tax returns." The tax returns for years other than 1973 showed that Falk had obtained and completed special forms, including a Schedule C claiming losses from Arm Industries. He had itemized deductions, including interest on stock loans, sales taxes and gasoline taxes, and had computed the tax consequences from the exchange of property and investment credits. It is true that the prosecutor cross-examined Falk rigorously and at length regarding his tax returns, perhaps unduly, but we cannot agree with appellant that this testimony was irrelevant. The Government was not questioning the propriety of the deductions in the tax returns for other years but seeking to establish Falk's understanding and handling of some unusual tax matters of comparable complexity.

### Prosecutor's Closing Argument

Appellant's principal contention is that the prosecutor's closing argument went so far beyond the bounds of fair comment as to require a new trial. Similar contentions

---

8. Appellant suggests "that the delay was solely for the purpose of gaining for the Government a tactical advantage over Mr. Falk" by "inducing a false sense of security in his mind and thereby obtaining additional evidence and admissions." The Government responds that "it must be assumed that much of the time was taken by the orderly processing of the case at the Internal Revenue Service and the United States Attorney's office in preparing to present the evidence to the Grand Jury."

9. The terms of "willful" and "knowingly" were defined as follows:

And the word "willful" means—as used in the indictment—means deliberately and intentionally as distinguished from something which is merely careless, inadvertent or negligent, that's to say that the defendant must have known and specifically intended his return to be false when he caused it to be made and subscribed to by him.

Now, the word "knowingly" as used in the crime charged means that the act was done voluntarily and purposely and not because of any mistake or accident. "Knowledge" may be proved by the defendant's conduct and by all of the facts and circumstances surrounding the case. No person can intentionally avoid knowledge by closing his eyes to facts which should prompt him to investigate.

have been asserted and considered by this court in many cases. As noted in *United States v. Trutenko,* 490 F.2d 678, 679 (7th Cir. 1973), frequently "strong argument for reversal can be made. . . . Reversal would have the salutary effect of deterring similar prosecutorial misconduct in the future. In each case, however, we must evaluate the importance of error in the context of the entire trial before deciding to reverse." [10]

Prosecutorial misconduct in closing argument was considered by this court at length in *United States v. Spain,* 536 F.2d 170 (7th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976), where the court said in part:

> The line between the "undignified and intemperate" (*Berger v. United States,* 295 U.S. [78] at 85, 55 S.Ct. [629] at 632, 79 L.Ed. [1314] at 1320) and the "hard" (*id.* at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321) or "harsh" (*United States v. Freeman,* [(7 Cir.)] 167 F.2d 786 at 791) but fair, is not susceptible of ready definition. It can only be located through a sense of fitness and taste and an appreciation of the prosecutor's proper role (*Berger,* 295 U.S. at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321). Those who cannot discern that line with confidence had best stay a safe distance away from it.

*Id.* at 175–76.[11]

The Supreme Court in *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), in considering the propriety of the prosecutor's closing argument recognized that not every trial error or infirmity constitutes "failure to observe that fundamental fairness essential to the very concept of justice," citing *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941). The Court said in part:

Such arguments, like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have the most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Id.* 416 at 646–47, 94 S.Ct. at 1873.

In *United States v. Castenada,* 555 F.2d 605 (7th Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977), the defendant contended that the Government committed prejudicial error in questioning a witness and in closing argument. In rejecting this contention the court said:

> Viewing the record and trial in their totality, we cannot conclude that these irregularities had any likelihood of changing the result of the trial. The remarks do not approach the level of constitutional magnitude. The Supreme Court has emphasized the difference between the "ordinary trial error of a prosecutor" and "egregious conduct" amounting to a denial of due process. (Citing *Donnelly v. DeChristoforo, supra,* 416 U.S. at 647, 94 S.Ct. 1868).

555 F.2d at 610.

■ We shall consider the alleged misconduct of the prosecutors in light of these principles. Appellant first complains that the prosecutor twice referred to the offense as "tax evasion," whereas Falk was charged with filing a false return. On one occasion, when counsel for the defendant objected,

---

10. In *Trutenko* a doctor was charged with using the mails to defraud insurance companies. In closing argument the prosecutor suggested to the jury that the reason they were "paying plenty in premiums" was "because the insurance companies are forced to pay out on phony claims, and that is what the majority of these are." Recognizing that this comment was "undeniably improper," the court still concluded that the error was not, in view of all instructions given the jury and other circumstances in the case, prejudicial to the defendant.

11. The court noted that records recently before the court have too often disclosed improper prosecutorial arguments and states, "In the future all federal prosecutors in this circuit will confirm [sic] their arguments to the standards set by the Supreme Court in the *Berger* case."

the court said that, "Counsel may make the comment that he avoided the payment of them at that time." In the charge to the jury the court read the charge from the indictment, quoted from the statute, and instructed the jury that Falk was not on trial for any acts or conduct not alleged in the indictment. The jury was advised many times that the statements of the lawyers were not evidence. While counsel was in error in referring to "tax evasion," it does not appear that he was attempting to mislead the jury, and we do not find the remarks unduly prejudicial, particularly in view of the court's instruction.

Counsel for the Government referred to Falk's purchase of an airplane in 1974 and that he was "taking all kinds of tax write-offs and tax deductions for that airplane. He has a computation of investment credit here." We cannot agree with appellant that the Government was arguing that Falk would have cheated on his 1974 tax return had the Internal Revenue Service not been investigating him. Rather the prosecutor was using this as an illustration of Falk's ability to understand and compute investment credits.

Appellant argues that the Government asked the jury to act as the "conscience of the community" and "suggested that any verdict except guilty would be a blow to law enforcement" in the following comment:

I am not going to stand here and ask you to return a verdict of guilty against Mr. Falk because he subscribed to a false return, a false tax return, I am asking each of you to do what justice demands for ourselves and for the other people in this district, [who] obeyed the law and claimed their taxes.

In support of this contention appellant relies in part on *United States v. Lewis,* 547 F.2d 1030 (8th Cir. 1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977). In *Lewis,* however, the court held

that "[u]nless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible" and that the remarks in that case did not exceed the bounds of advocacy.[12]

Most questionable were two statements of counsel which appellant contends were made to appeal to the pecuniary interest of the jurors. The two statements in their entirety are:

Mr. Hedrick: (In opening argument for Government)

O.K., if I may conclude, Judge, the fact is that if there are people who are not paying their fair share, the rest of us have to make up . . . .

Miss Lavin: I will object again, your Honor.

The Court: Well, counsel may make a general comment.

Mr. Nixon: (In rebuttal argument for Government) We all file returns. . .

Miss Lavin: (Counsel for defendant): Object your Honor.

The Court: Overruled.

Mr. Nixon: There are millions of us every year that stay within the confines of the law. We report our income.

■ This court held in *Trutenko, supra,* that an appeal to the pecuniary interest of the jurors is improper. At oral argument counsel for the Government conceded the impropriety of these comments, but argued that when viewed in the context of the entire argument they did not "affect substantial rights" under the rule recognized by this court in *United States v. Castenada, supra.* We agree. As in *Castenada,* we cannot conclude that these two comments had any likelihood of changing the result of the trial.

■ Appellant argues that the prosecutor's impropriety "reached its nadir" when it was suggested in rebuttal that "he, the prosecutor, possessed information which, if

---

**12.** In affirming the conviction in *Lewis,* the court noted that the test to be applied is whether the argument is so offensive as to deprive the accused of a fair trial and that any alleged error must be assessed in the context of the entire trial, and not in isolation. 547 F.2d at 1037.

available to the jurors, would certainly convince them of guilt." The portion of the rebuttal argument which formed the basis of this contention must be considered, however, in the light of the closing argument of defense counsel, in which she said in part:

> And while we are speaking of time, and here is a matter for you to mull over in the exercise of your common sense, remember that it was way back in November of 1975 that Mr. Starr recommended this case for prosecution. Ask yourselves why it took almost three years to ask for and obtain this indictment. Maybe they weren't so sure either. Maybe they recognize a reasonable doubt.

In rebuttal Government counsel responded:

> Miss Lavin made a comment as to why it took three years to bring this case. A case is reviewed up and down the line; a case is written  .   .  . .
>
> Miss Lavin: Object, your Honor. He is testifying now.
>
> Mr. Nixon: Your Honor. The question is
>
> .   .   .
>
> The Court: Well, I assume that he is entitled to make some rejoinder to the comment, "why did it take three years?" but let's do it very quickly.
>
> Mr. Nixon: Yes, your Honor, one minute. A case is reviewed up and down the line. A case not only is written by the agent who makes a recommendation, it goes to his superior and to Washington and back, and once that case comes back then it is brought in our courts. That is why it takes three years. It is not because there was some question as to whether or not he was guilty or not. Or whether or not he had committed an offense. It is because there is a system of review in terms of these cases. A fair system.

While it is true that the Government's rebuttal argument went outside the record, the response was invited by the argument of defense counsel. Viewed in that context it is clear that the prosecutor was explaining the delay rather than insinuating that he "knew better than the jury what the truth was." [13]

### Original Notes of Agent Friedman

■ Finally, appellant argues that he was denied his rights under the Jencks Act (18 U.S.C. § 3500) when the prosecution failed to turn over the original long-hand notes made by Agent Friedman when he interviewed Falk in August, 1974. The notes were used by Friedman two months later in preparing a Memorandum of Interview which he turned over to Special Agent Starr. A copy of this memorandum was given to Falk's counsel. There is no evidence that the memorandum varied from the original notes.

Appellant admits that no demand or request was made by his trial counsel for the original notes, as required by § 3500, but argues that a demand was unnecessary in view of the well recognized practice in the Northern District of Illinois of producing such notes.

Falk's counsel developed on cross-examination of Friedman that he had made the notes at the time of the interview. At the time of trial Friedman was no longer employed by the Government and was unable to say whether his original notes were still in existence. Counsel did not then request their production, but in closing argument stated that the "notes don't exist" because "the 'Government has a duty to produce them if they existed, and that they did not produce them.'" It may well be that as a matter of trial strategy, counsel preferred to use the absence of the notes to attack

---

13. While we have concluded that the Government's closing argument does not require a reversal in this case, once again we admonish Government counsel to observe recognized standards in their closing arguments. *See, e. g.,* American Bar Association Standards Relating to The Prosecution Function, and particularly § 5.8 Argument to the Jury. Failure of Government counsel to observe proper standards in their closing arguments has resulted, all too frequently, in this court's devoting substantial time to reviewing the record to determine the probable effect of the improper argument. It may well in some case result in a reversal which could have been avoided by adherence to proper standards.

Friedman's credibility. No motion was made by Falk's trial counsel to strike Friedman's testimony; nor was the failure to strike his testimony included in the motion for new trial. Under these circumstances the trial court did not err in failing to strike Friedman's testimony.

The judgment of conviction is affirmed.

TONE, Circuit Judge, concurring.

Judge Swygert's dissent leads me to add a few words in explanation of why I have joined in Judge Jameson's opinion. A careful reading of the final arguments in their entirety convinces me that the prosecutor's improper statements were harmless, judged by the standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *see also United States v. Shepherd*, 576 F.2d 719, 723–24 (7th Cir. 1978). I can say, in Mr. Justice Rutledge's words in *Kotteakos*, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." 328 U.S. at 765, 66 S.Ct. at 1248.

The prosecutor's statements about tax evasion, read in context, were not an effort to rely on, or create prejudice by referring to, conduct not charged in the indictment. The offense charged was failure to report income, and of course the defendant did not pay taxes on the income he did not report, and the evidence so showed. The acts proved amounted to both false reporting and failure to pay taxes that were due. If done wilfully they amounted to tax evasion as well as deliberate false reporting. The only seriously contested issue, and the issue on which both sides focused in closing arguments, was whether defendant's conduct was wilful. The jury was properly instructed that the charge against the defendant was false reporting. The references to tax evasion could hardly have misled the jury or prejudiced the defendant.

The most serious prosecutorial improprieties, statements to the effect that if some people do not pay their taxes others will have to make up the deficiency, were in a sense an appeal to the jurors' pecuniary interests. Those interests are, of course, *de minimis* so far as the amount involved in this case is concerned; and the statements themselves amount to no more than the assertion of what must be obvious to anyone upon a moment's thought. I cannot believe the statements could have influenced the jury when considered in the context of the argument as a whole and the trial as a whole.

This is not to say that deliberate prosecutorial misconduct should be tolerated or that statements of the kind described above should be encouraged or approved even when innocently made. When, however, they appear, as they do to me here, to be the result of inexperience and the heat of battle rather than intentional disregard of the rules of professional conduct, and the reviewing court determines that they were harmless, justice would not be served by requiring that the case be tried again.

Senior District Judge JAMESON joins in Circuit Judge TONE'S concurring opinion.

SWYGERT, Circuit Judge, dissenting.

In all cases the constitutional safeguards are to be jealously preserved for the benefit of the accused, but especially is this true *where the scales of justice may be delicately poised between guilt and innocence.* Then error, which under some circumstances would not be ground for reversal, *cannot be brushed aside as immaterial since there is a real chance that it might have provided the slight impetus which swings the scales toward guilt.* *Glasser v. United States*, 315 U.S. 60, 67, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942) (emphasis added).

The records before us recently have too often disclosed prosecutorial arguments which, while not rising to the level of plain error, were nevertheless improper. If this continues, this court may find it necessary in appropriate cases to exercise its supervisory authority, even in the absence of plain error. *In the future all federal prosecutors in this circuit will*

*conform their arguments to the standards set by the Supreme Court* in the *Berger* case.

*United States v. Spain,* 536 F.2d 170, 176 (7th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976) (emphasis added).

The above quotations should be the text for this court to reverse the conviction in this case. The assistant United States attorney flagrantly abused the precepts of *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), in his summation to the jury. Not only did he twice misstate the charge for which defendant was on trial, but he also twice appealed to the pecuniary interests of the jurors. The Government now concedes the prosecutor's misstatement that Falk evaded taxes (even though he was not charged with tax evasion), but it contends this impropriety was cured by the trial court's general instructions. Yet, the record shows that the trial court did nothing specifically to cure the gross impropriety when it occurred. Indeed, the judge abetted it, as the record clearly demonstrates. The summation reads in relevant part:

> [Prosecutor:] There is obviously a law enforcement interest as determines to *tax evasion* and everytime that a person was caught *evading* taxes and they said "okay, we will pay you back", well then, *tax evasion* becomes a no risk business; you *evade* it as long . . until you get caught . . . and then you just pay what you owe. A great business!
>
> That's why the case is being prosecuted, because that is no way to run a society and it is no way to run a government.
>
> Defense counsel: Object to that.
>
> The court: Well counsel may make his comments . . . (Tr. 270) (emphasis added).

And the rebuttal reads:

> [Prosecutor:] [Defense counsel] talks about a Supreme Court case and his legal right to decrease or avoid his taxes. He exercised those legal rights from 1969 until 1972 when he could get

a gain from a deduction . . . but did he exercise that right in 1973 when he made $10,000.00? No. He didn't avoid taxes, that's not against the law, *he evaded them in 1973.*

> Defense counsel: Object again, your Honor. That is not the charge in the indictment.
>
> The court: Counsel may make the comment that he avoided the payment of them at that time. (Tr. 294) (emphasis added).

Similarly, there can be no question that the assistant United States attorney appealed directly to the pecuniary interests of the jurors as taxpayers when he said:

> [Prosecutor:] We all file returns . .
>
> Defense counsel: Object your Honor.
>
> The court: Overruled.
>
> Assistant United States attorney: There are millions of us every year that stay within the confines of the law. We report our income. (Tr. 291).

And again:

> [Prosecutor:] O.K., if I may conclude, Judge, the fact that if there are people who are not paying their fair share, the rest of us have to make up . . .
>
> Defense counsel: I will object again, your Honor.
>
> The court: Well, counsel may make a general comment. (Tr. 273).

Such an appeal is clearly improper, *United States v. Trutenko,* 490 F.2d 678 (7th Cir. 1973); *United States v. Lotsch,* 102 F.2d 35, 37 (2d Cir.), *cert. denied,* 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939); *Taglianetti v. United States,* 398 F.2d 558, 566 (1st Cir. 1968), *aff'd,* 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969); *Buttermore v. United States,* 180 F.2d 853, 856 (6th Cir. 1950); *United States v. D'Anna,* 450 F.2d 1201, 1206 (2d Cir. 1971), and alone calls for reversal.

The improprieties of the assistant United States attorney in this trial cannot be dismissed as the "ordinary" trial errors of a conscientious prosecutor. *See United States v. Castenada,* 555 F.2d 605, 610 (7th

Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977). The majority opinion reads like an apologetic litany for the prosecutor's transgressions; it is difficult to believe that his improper actions, often repeated after objection from defense counsel, were honest mistakes.

Unfortunately flagrant abuses of professional standards, such as the foregoing, seem to be occurring more frequently in this circuit. I believe that the reasons include the fact that competitive and ambitious prosecutors (perhaps reflecting the ethos of the 1970's) think that to win by any means is the "name of the game." Further they are emboldened to flaunt the *Berger* admonition by the inaction of trial judges who fail to stop such improper advocacy conduct in its tracks and this court's bark— scoldings and warnings—with no bite.