UNITED STATES of America, Plaintiff-Appellee,

v.

Rafael PEREZ–LEON & Juan Gonzalez, Defendants-Appellants.

Nos. 83–3166, 83–3185.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1984.

Decided March 8, 1985.

Ruben Castillo, Asst. U.S. Atty., Dan K. Webb—U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Gerald M. Werksman, Gerald M. Werksman, Chicago, Ill., for defendants-appellants.

Before ESCHBACH, COFFEY, Circuit Judges, and DUPREE, Senior District Judge.*

COFFEY, Circuit Judge.

This is a consolidated appeal from a decision of the United States District Court for the Northern District of Illinois, the Honorable William T. Hart presiding. The defendant-appellant, Rafael Perez-Leon, appeals his conviction for one count of conspiracy to possess with intent to distribute and three counts of distribution of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively. The second defendant-appellant, Juan Gonzalez, also appeals his conviction of one count of conspiracy to possess with intent to distribute and one count of distribution of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively. We affirm as to each defendant.

### I.

On June 1, 1983 both of the defendants were arrested in a Holiday Inn hotel room in downtown Chicago after attempting to sell four kilos of cocaine to undercover Drug Enforcement Administration ("DEA") agents. The arrest was the culmination of months of undercover work by DEA agents and their informant, José Ramirez.

Ramirez testified at the trial that he was a paid informant for the DEA and that he had received an assignment from one of its agents, an Agent Callanan, to make a drug contact at the La Perlita jewelry store in Chicago. Between February and June of 1983, Ramirez testified that he went to the La Perlita store on five separate occasions, the first time in February of 1983 when he met the defendant, Rafael Perez, the owner of the jewelry store. Ramirez testified that he attempted to gain Perez's confidence by purchasing a bracelet and leaving

* The Honorable Franklin T. Dupree, Jr., Senior District Judge for the United States District Court for the Eastern District of North Carolina, is sitting by designation.

jewelry to be cleaned. During Ramirez's third visit to the store in either late April or early May, his conversation with Perez turned to drugs and at this time Ramirez asked Perez if he was interested in doing business with him. Perez allegedly inquired as to the type of business Ramirez was referring to and Ramirez responded by asking Perez if he was interested in buying five kilos of heroin. Perez allegedly stated, "I don't want to deal in drugs right now. I've been burned before." [1] At trial, Ramirez blurted out his unsolicited interpretation of Perez's statement by stating that Perez meant that he (Perez) had been arrested before. The defense properly objected and the court admonished the jury to disregard the testimony. Ramirez further testified that Perez told him that he was dealing with gold (apparently meaning jewelry) at the time when he was approached by Ramirez but that if Ramirez wanted to leave his phone number he would see if he (Perez) could get in touch with people he knew were presently dealing in drugs. He promised to get back to Ramirez. A few days later Ramirez again visited the store and asked Perez why he had not called; Perez responded that he had lost his phone number. Ramirez asked Perez whether he was still interested in the heroin business and Perez responded by inquiring when Ramirez was going to bring him a sample.

On May 16, 1983, Ramirez returned to the store and advised Perez that he had talked to his drug contacts but was unable to obtain a sample of heroin. Ramirez explained that the only way that they would be able to do business was for Perez to take the heroin on consignment. Perez then inquired as to the price for the heroin and Ramirez stated that it was $25,000 per kilo. Perez then allegedly stated "the price is good. I use to pay $25,000 for good heroin." According to Ramirez the discussion switched to other drugs and he told Perez that he had friends who were willing to invest $200,000 in cocaine. Perez responded that he would have to see "some people," but that he thought four kilos might be available. He then suggested to Ramirez that he contact his friends and get the cash together.

On May 24, 1983, Ramirez went back to the store (with the accompanying DEA agents conducting surveillance outside the store). Ramirez and Perez agreed on a price of approximately $54,000 for the cocaine and Perez told Ramirez that he would have the sample the next day. Ramirez did not return the following day, but returned on May 26th. Perez asked Ramirez why he was not at the store the previous day and Ramirez responded that other business had detained him. Perez told him to come back at 5:30 p.m. that day for the cocaine sample. When Ramirez appeared at the store later in the day, Perez came into the store with the defendant Juan Gonzalez and his nephew Manuel Vargus. Perez and Ramirez went to the back of the store where Perez gave a sample of cocaine to Ramirez. On May 27, 1983, Ramirez made a call from the DEA office to Perez in order to discuss the deal. During the conversation Perez urged Ramirez to push the deal along after Ramirez told Perez that he had not yet been given approval to participate in a drug deal with him.[2]

1. During this conversation, Ramirez testified that Perez pointed a gun at Ramirez and told him that if he was a police officer, he (Ramirez) would be killed. Ramirez also stated that Perez patted him down.

2. The English transcript of this conversation reads as follows:

Agent Callanan: "... I 81–0015 to uh ... telephone number, area code (312) 666–2010. Uh ... the date is May 27, 1983. The time is 3:45 p.m.
Recording: "We're sorry, your call did not go through. Will you please try your call again.

Dial Tone.
Unknown Male: "Perlita.
Jose Ramirez: "Hello. Is Rafael there?
Unknown Male: "Yes. Wait
  (Pause)
Perez: "Hello.
Jose Ramirez: "Champion.
Perez: "Tell me boss.
Jose Ramirez: "How are you doing there?
Perez: "So, so.
Jose Ramirez: "What's new?
Perez: "Nothing.
Jose Ramirez: "Nothing. (laughs) I took the photo to the man and he hasn't called me back.

On May 31, Ramirez returned to the store and asked for another, larger sample of cocaine. Perez then engaged in a private discussion with Betencourt (not a party to this appeal), who was present at the store. Betencourt retrieved a larger sample and Perez told Ramirez it would cost $300.00. Later that day, Ramirez picked up Perez at the store and took him to the Holiday Inn to meet with Agent Menendez, who was posing as a drug buyer. Menendez testified that Perez appeared uneasy at first but then relaxed after small talk concerning Menendez's Puerto Rican roots. During the course of the conversation, Menendez stated that Perez bragged about his reputation as a drug dealer and that when Agent Menendez indicated he may want to make future purchases, Perez indicated that he could supply Menendez with almost any quantity Menendez desired. After the parties agreed to handle the transaction at the hotel on the following day, Perez told Menendez that he had to leave in order to meet his contacts to set up the deal. After the meeting, a government agent followed Perez to the Diplomat Hotel in Chicago, Illinois where Perez entered Room 39, the room registered to the defendant Juan Gonzalez.

On June 1, 1983, Ramirez met Perez and Menendez at the Holiday Inn. Perez instructed Menendez to go to his hotel room, which was next to the defendant's room, to get the money for the cocaine. Ramirez went with Perez to Perez's room where he met Gonzalez and Betencourt. At trial,

Ramirez testified that Gonzalez directed Betencourt to get the cocaine from the closet and open the bag for inspection. Perez decided to make the cocaine exchange through the inner doors connecting the two rooms. Ramirez testified that he went back to the agent's room where he told the agents of Perez's wish and Gonzalez's statements made in the room. When Perez opened the inner door between the rooms, the DEA agents stepped in and placed Betencourt, Gonzalez, and Perez under arrest. On top of the bed in the room was a bag containing two kilograms of cocaine. The cocaine was later determined to be 94%–99% pure with a street value of $1.2 million.

At the trial, Perez took the stand in his defense and claimed he was entrapped by the DEA. He testified that he met Ramirez during the summer of 1982[3] and that during the time he had known Ramirez, he (Ramirez) was always talking about drugs and that on several occasions Perez told him that he was not interested. He further testified that in May, Ramirez came to the store and told Perez that his (Ramirez) life was in danger since he had given one of his connections bad drugs. He asked Perez for a loan of money but Perez told him that his jewelry business was not doing well at the time. Ramirez then asked Perez if he could contact any people he knew in the drug business to arrange a good deal with his connection. Perez testified that he believed he was attempting to help a friend in

Perez: "Uh, huh.
Jose Ramirez: "So, we'll see what's going on, you know.
Perez: "He hasn't told you anything yet?
Jose Ramirez: "No, he hasn't called yet.
Perez: "Well ... besides .. Get going, brother. Those people, that if it isn't ... if ... if they're not used, he will ... you sell them today. The rings must be returned to the guy. (It was established at trial that 'rings' is slang for cocaine.)
Jose Ramirez: "Really?
Perez: "Yes.
Jose Ramirez: "Oh. Then, you already have it?
Perez: "No, I don't have anything but ... you know.
Jose Ramirez: "Yes. Okay, let me ... I'm just waiting for his call.

Perez: "Give him a buzz. Call him back.
Jose Ramirez: "Yes, of course.
Perez: "Okay?
Jose Ramirez: "No, but ... I'll let you know.
Perez: "Because that chance ends today.
Jose Ramirez: "I'll let you know.
Perez: "Okay.
Jose Ramirez: "Alright.
Perez: "Bye.
Jose Ramirez: "Bye."

**3.** An employee of Perez also testified that he had seen Ramirez in the store approximately twenty times prior to the month of February in 1983. On cross-examination the government challenged his credibility by disclosing that his primary source of income was from his employment at the store and, thus, he was dependent upon Perez for his support.

need. He also testified that Ramirez suggested he (Perez) talk and act like a big time drug dealer when he made the deal with Agent Menendez.

Gonzalez's primary defense at the trial was to attack Ramirez's credibility, especially Ramirez's testimony that Gonzalez had told Betencourt to retrieve the cocaine prior to the cocaine exchange in the hotel room.

On appeal, Perez reasserts his argument that he was entrapped by the DEA and Ramirez, its informant. He further asserts that the government's objections during his counsel's closing arguments, when taken together with Ramirez's reference to his (Perez's) prior arrest for drug possession, and statements received into evidence that Ramirez was directed by the DEA to the LaPerlita store, unfairly prejudiced the jury. Gonzalez, on the other hand, argues that a statement[4] made by the government prosecutor in her closing argument referred to evidence outside of the record and was so prejudicial that his verdict must also be reversed. Initially, we address the issues raised by Perez.

## II.

Perez asserts that the evidence was insufficient to rebut his claimed defense of entrapment. We disagree and hold that there was more than sufficient evidence to establish that the defendant was not entrapped but possessed the requisite predisposition to commit the crime.

"To raise the [entrapment] defense a defendant must produce evidence of both the Government's inducement and his own lack of predisposition. Once a defendant accomplishes this, the burden shifts to the Government to prove beyond a reasonable doubt that the defendant was predisposed or that there was no Government inducement." *United States v. Gunter*, 741 F.2d 151, 153 (7th Cir.1984). When determining whether the government had met its burden in proving that the defendant was pre-

disposed to commit the crime, we must view the evidence in the light most favorable to the government and will affirm if any rational trier of fact could have found the requisite predisposition beyond a reasonable doubt. *Id.* at 154.

Predisposition "refers to whether the defendant had a readiness or willingness to commit the offenses charged, or whether the government 'implant[ed] in the mind of an innocent person' the disposition to commit the offense." *United States v. Fields*, 689 F.2d 122, 124 (7th Cir.), *cert. denied*, 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982) (*citing Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932)). The factors relevant in determining the predisposition of the defendant are: (1) assessing the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of criminal activity was made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant expressed reluctance to commit the offense which was overcome only by repeated government inducement or persuasion; and (5) the nature of the inducement or persuasion applied by the government. *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir.1983). As the court recognized in *Kaminski* none of these factors, when considered by themselves, are determinative; however, the most important factor is whether the defendant evidenced a reluctance to engage in the criminal activity that was overcome only by repeated government inducement. *Id.*, citing *United States v. Reynoso—Ulloa*, 548 F.2d 1329, 1336 (9th Cir.1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). After reviewing the record in this case, especially with an eye to the fourth factor in the *Kaminski* analysis, i.e., the defendant expressed reluctance to engage in the deal that was overcome only through repeated government inducements, we hold that the evidence clearly

---

**4.** "Why didn't the Government put on the other statements? Well you remember ladies and gentlemen of the jury, we put Agent Callanan back on the stand and as soon as we put him back in the stand we heard objections from Mr. Holloway...."

demonstrates Perez definitely was not reluctant to engage in the drug transaction and, thus, the jury was justified in rejecting Perez's entrapment defense.

▮ The only witnesses to the exchanges between Ramirez and Perez were the two parties themselves. Although Ramirez's credibility was attacked by the defense, the jury obviously resolved the discrepancies between the two versions of the drug transactions in favor of Ramirez's version. This was the prerogative of the jury. *United States v. Townsend,* 555 F.2d 152, 156 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977); *see also Kaminski,* 703 F.2d at 1007 (credibility of informant is a question of fact for the jury: "[O]n appeal we are limited to considering whether the evidence established entrapment as a matter of law, which only occurs when the absence of defendant's predisposition appears from the uncontradicted evidence."). In this case, it is uncontested that Ramirez initially suggested the drug deal. However, mere solicitation by itself by a government agent is not sufficient to establish the entrapment defense. *See e.g., Gunter,* 741 F.2d at 154; *United States v. Perry,* 478 F.2d 1276, 1278 (7th Cir.), *cert. denied,* 414 U.S. 1005, 94 S.Ct. 363, 38 L.Ed.2d 241 (1973). After Ramirez proposed the heroin deal, Perez did not turn him down but instead expressed reluctance to deal at that point in time because of his prior drug dealing experience (Perez commented, "I've been burned before"). However, Perez went on to state that Ramirez should leave his phone number in case Perez was able to get in touch with people who could deal with Ramirez. Perez tried to convince the jury that Ramirez only succeeded in getting him to agree to the drug transaction after he (Ramirez) told Perez that his life was in danger because of a previous bad drug deal. The jury was free to reject, and obviously did reject, Perez's less than plausible explanation. *See Town-*

*send,* 555 F.2d at 157. After his momentary and initial reluctance to participate, Perez expressed no hesitation in engaging in the drug transaction. Perez's eagerness is certainly demonstrated by the taped phone conversation of May 27, wherein Perez urged Ramirez to push forward with the drug transaction. Further, during one of Ramirez's visits to the store, Perez demonstrated his sophistication and knowledge of the drug business by stating that the price for the offered heroin was a good one. He then asked for a sample. Also, while negotiating the details of the drug exchange with Agent Menendez, who posed as the drug buyer, Perez bragged that he was well-known in the drug business and could supply much more cocaine to Menendez if needed. Finally, Perez's predisposition is indicated by the large quantity of cocaine he was able to secure within a few weeks time. *Gunter,* 741 F.2d at 154.[5] Although there was no evidence presented at trial as to any past convictions, Perez's actions hardly demonstrate that he was a naive person exploited by the government. The evidence, when viewed in the light most favorable to the government, establishes that Ramirez solicited the deal and that Perez expressed slight hesitation, which may have been caused by the very nature of drug transactions in that a new buyer is usually checked and cross-checked to the best of his supplier's ability. "Drug dealers are not known to call potential clients and solicit their business, rather a dealer who expects to stay out of jail is careful about to whom he sells." *Id.* at 153. There was more than sufficient evidence to establish that Perez was predisposed to commit the crime.

The defendant Perez, in addition to raising his entrapment defense, alleges that prejudicial statements made during the trial denied him his right to a fair trial.

---

5. In *Gunter,* the informant made a number of contacts with the defendant between February 11 and April 5, 1983. On April 5, the informant and the defendant agreed to a cocaine transaction. On that same day, the defendant was able to supply 12.3 grams of cocaine to the informant. In this case, it took Perez less than two weeks to supply two kilograms of cocaine, which is approximately 180 times the amount supplied by the defendant in *Gunter.*

■ The first alleged prejudicial statement occurred during his defense counsel's closing argument to the jury when the government interrupted to object to his counsel's characterization of the law:

"I guess the prosecution wants you to believe that Ralph Perez is a drug dealer. Now let me tell you something about the entrapment defense. You can raise it; and when you raise it you open the door. When I say 'open the door' I mean they can come in, both guns blazing. They can give you evidence of prior drug dealings."

[Asst. U.S. Attorney]: I object. That is not the fact. That is not the case and he knows it.

[Defense Counsel]: That is the case, your honor.

May I proceed? They can bring in any prior convictions of drug dealings that they have. They can bring in other witnesses to say that Ralph Perez had previously dealt drugs."

Perez argues that when the prosecutor interrupted, he misstated the law and thus improperly prejudiced the jury. We disagree and hold that the government's objection to the defense counsel's argument that the government was allowed to bring in evidence of prior drug dealings was entirely proper within the context of the evidence before the district court. Even defense counsel's response to the objection indicates as much. He first stated that "[t]hey can give you evidence of any prior drug dealings." Then, after the objection by the U.S. Attorney, he stated, "[t]hey can bring in any prior convictions of drug dealings that they have." The last statement was a proper characterization of the "law," but

the first statement was not since the district court had previously ordered the government not to question the defendant about his prior arrests.[6]

■ The second alleged prejudicial statement occurred when Ramirez testified as to a conversation between himself and Perez in which Perez told Ramirez that he had "been burned before," which Ramirez gratuitously interpreted for the jury as meaning that Perez had been previously arrested. The court *sua sponte* properly admonished the jury to disregard the remark. "'In each case … we must evaluate the importance of [an alleged] error in the context of the entire trial before deciding to reverse.'" *United States v. Falk*, 605 F.2d 1005, 1011 (7th Cir.1979), *cert. denied*, 405 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980) (explanation added). Because the jury was properly instructed to disregard the unsolicited remark, no other reference to the arrest was made during the remainder of the trial and the evidence of guilt was substantial, we hold that this unsolicited comment when considered within the context of the entire trial does not rise to the level of prejudice as to warrant a reversal and a new trial.

■ Finally, Perez specifically points to testimony by Ramirez, that he (Ramirez) was told by his DEA supervisor to make a contact at the La Perlita store, and argues that this testimony unduly prejudiced the jury since the jury could infer that Perez was the target of the DEA investigation because of prior criminal behavior. We disagree. Perez's counsel had earlier cross-examined Agent Callanan in an attempt to cast Ramirez as a roving "head-

---

**6.** Earlier in the proceedings, the court instructed the government that it could not confront Perez with his prior arrest for possession of narcotics when questioning the defendant about his reaction to Ramirez's proposed drug transaction offer. The district court judge stated that he would allow the prior arrest to come into evidence only if the defendant volunteered evidence of this arrest during his cross-examination, but the government could not directly ask the defendant about it.

Perez argues that *United States v. Berry*, 661 F.2d 618 (7th Cir.1981), gives the government carte blanche authority to submit any evidence of prior drug transactions and, thus, his counsel's comment during closing argument was a correct characterization of the law. We do not read *Berry* as broadly as does the defendant. In *Berry*, and the cases cited therein, the court allowed submission of the defendant's prior convictions into evidence, not his arrests.

hunter." [7] It appears Ramirez's testimony as to his assignment was relevant to rebut the defendant's attempt to paint Ramirez as a headhunter and, thus, it was properly received since it established that Ramirez was under the supervision of the DEA. Further, we do not believe the sole inference from this testimony was that Perez was targeted because of previous criminal behavior since Ramirez never stated the reason he was sent to the La Perlita store. [8] Thus, this testimony in no way prejudiced Perez's defense.

### III.

The defendant Gonzalez asserts that certain statements made by the prosecutor in her closing arguments were so prejudicial as to merit reversal of his conviction. We will briefly summarize the facts which led up to the alleged improper statements.

Ramirez testified that he had told the government agents, who were positioned next to the defendants' room prior to their arrest, that Gonzalez had directed Betencourt to retrieve the cocaine from the closet. On cross-examination, Gonzalez's counsel attempted to impeach Ramirez by inquiring as to the lack of any reference to Gonzalez in Agent Callanan's May 26th report. [9] The government's objection to this question was sustained. Gonzalez's counsel then attempted to impeach Ramirez by noting omissions in Ramirez's June 24th report. [10] After Ramirez completed his testimony the government recalled Agent Callanan in an apparent attempt to rehabilitate Ramirez; however, Gonzalez's counsel objected to the government's questions regarding the nature of his reports. The district court sustained the defendant's objection, but noted that the government could recall Agent Callanan during its rebuttal case. However, on rebuttal the government chose not to recall any witnesses.

Gonzalez's counsel argued during closing argument that the failure of the government to rehabilitate Ramirez's testimony concerning statements supposedly attributable to Gonzalez in the room prior to the arrest cast doubt on Ramirez's version of the events that had transpired in the hotel room. During the defense counsel's closing argument, the government objected on several occasions on the basis that the defense counsel was referring to improper hearsay. [11] The district court warned the

---

7. The questions concerned the fact that Ramirez was working on other drug cases, the physical searches before and after the contacts with Perez, and the fact that he was paid on a commission basis for all narcotics convictions.

8. We do not agree with the defendant Perez that the unequivocal implication of this testimony was that he (Perez) was the target of the investigation because of past wrongful conduct. Certainly, the jury was free to infer that Ramirez may have been attempting to make contacts with others, but that his contact with Perez was the one that developed into the drug transaction.

   Perez himself testified on direct examination that persons had in the past come into his store and offered Perez the chance to participate in drug transactions. Perez naturally testified that he had refused all such offers. From this testimony, the jury could have concluded that the DEA, in targeting the La Perlita store, was attempting to make contact with any person at this store since Perez's own testimony indicated that other persons had been in the store attempting to sell drugs.

9. May 26th was the day that Perez and Gonzalez were in the LaPerlita store together where a cocaine sample was exchanged between Ramirez and Perez.

10. In this report, the only one filed by Ramirez in this case, Ramirez stated that Gonzalez had directed Betencourt to retrieve the cocaine from the hotel's closet. On direct examination, Ramirez had used the word "perico" to describe cocaine; on cross-examination, defense counsel attempted to impeach Ramirez by noting the inconsistency between his testimony on the stand and his statement in the report using the word cocaine. However, on redirect it was established that perico is spanish slang for cocaine.

11. Statements made by Gonzalez's defense counsel that the government found objectionable are:
    "Mr. Menendez, did you hear him say Jose Ramirez came in there and for the first time, a person that they have never even seen before, is all of a sudden doing the directing, the orchestrating, he tells him, Menendez and the rest of the agents, this elderly Cuban gentleman that I only saw once before is all of a sudden directing traffic.
    "Don't you think Menendez would have said that?

defense counsel that he was close to improper argument. In its closing argument, the government responded to defense counsel's closing argument by stating, "why didn't the Government put on the other statements? Well, you remember, ladies and gentlemen of the jury, we put Agent Callanan back on the stand and as soon as we put him back in the stand we heard objections from Mr. Holloway...." The district court then admonished the government to stay with the evidence. The government claims that the statement made during closing argument was an invited response or, in the alternative, that it at most constituted harmless error.

The defense counsel's obvious objective in its closing argument was to have the jury infer that Ramirez was lying when he testified that Gonzalez had directed Bettencourt to retrieve the cocaine from the hotel closet and that the government was unable to present any testimony from a DEA agent to corroborate Ramirez's story. Defense counsel had earlier questioned two agents as to the lack of any reference to Gonzalez in their reports, however, in his effort to argue Ramirez's lack of credibility, counsel's argument became a bit over-extensive when he referred to the govern-

"Don't you think—
[Government]: "Objection, Judge.

\*  \*  \*  \*  \*  \*

[Defense Counsel]: "That if Ramirez said that to six agents you would have heard from one of them? That was his testimony, 'I told the agents in the room,' he said.

[Government]: "Your Honor, I object to that. He knows that we can't bring in such evidence.

\*  \*  \*  \*  \*  \*

[Defense Counsel]: "Next he (Ramirez] says that when he went into the room—again I just talked about this—he told the agents about the conversation, about Juan Gonzalez's statements—not in one report, not one agent said, 'Yeah, he told us that in the room,' and, again, there is six of them.

[Government]: "I am going to object and I am going to ask for a side bar."

**12.** The government called only two of the six agents present, Agents Menendez and Callanan.

**13.** In *Bastone,* the defense counsel repeatedly referred to the government's failure to call certain witnesses to support its version of the in-

ment's failure to call any of the six agents who were in the adjoining room prior to the arrest.[12] This court has previously held that when the defense counsel "went outside the record in his closing argument referring to witnesses the government failed to call ..." (*United States v. Bastone,* 526 F.2d 971, 988 (7th Cir.1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976)), the prosecutor was justified in responding to the remarks. *See also United States v. Tasto,* 586 F.2d 1068, 1069–70 (5th Cir.1978).[13] It is fundamental that closing arguments should be limited to the facts received in evidence; however, it is equally true that where the defense counsel refers to evidence outside the record, the government may have to respond with an argument that normally would be considered improper. *See, e.g., United States v. Reagan,* 694 F.2d 1075, 1080 (7th Cir.1982); *United States v. Falk,* 605 F.2d 1005, 1013 (7th Cir.1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980); *see also, United States ex rel. Crist v. Lane,* 745 F.2d 476 (7th Cir.1984). The issue then becomes whether the government's remark concerning the objection to Agent Callanan's testimony was a proper invited response under the circumstances of this case.[14]

criminating event. The government retaliated in its closing argument by asserting that the defendants had also failed to call certain witnesses. *Bastone,* 526 F.2d at 988, nn. 15, 16.

In *Tasto,* the defense counsel argued in closing that the government "only put on one witness and not the many other persons who were present at the events under discussion and that the government could not truthfully put on additional witnesses." *Tasto,* 586 F.2d at 1070. The Fifth Circuit held the government attorney's response, "that she did not bring in more than one government agent to testify because she considered it unnecessary" was a proper response under the circumstances. *Id.* at 1069.

**14.** The defendant cites our decision in *United States v. Fearns,* 501 F.2d 486 (7th Cir.1974) as authority for its position that the prosecutor's comments in this case require reversal. In *Fearns,* our court held that the prosecutor committed reversible error in his closing argument when he explicitly referred to a prior consistent statement that was not in evidence in an attempt to bolster a witness's credibility. Our court noted that the comment constituted re-

Earlier in the trial, the trial court did not allow Agent Callanan, who was recalled to the stand after Ramirez's cross-examination, to testify during the government's case-in-chief; however, the district court did state that the government could recall Agent Callanan during its rebuttal. The government now argues that its response was proper since it could not recall Agent Callanan because (1) Gonzalez never presented a defense, and (2) defense counsel's closing argument referred to inadmissible hearsay when it cited the failure of the government to call agents to corroborate Ramirez's story.

As to the government's assertion that Gonzalez never presented a defense, it is clear from the record that Gonzalez did put forth a limited defense consisting of only direct examination of Perez and submission of a document. Also, the district court did ask for rebuttal, thus giving the government the opportunity to recall Agent Callanan; however, the government in its judgment decided not to present any further evidence. Concerning the argument that the defense counsel referred to inadmissible hearsay in its closing argument, it appears from our review of the record that since defense counsel had questioned Agent Callanan about the lack of any reference to Gonzalez in his reports, had the government recalled him his testimony might very well have been admissible under Fed.R.Evid. 801(d)(1)(B) as testimony to

rebut the implied charge that Ramirez had fabricated the statements supposedly attributed to Gonzalez in the hotel room. *See United States v. Guevara*, 598 F.2d 1094, 1100 (7th Cir.1979).[15] The defense counsel in this case opened the door when it argued that the government had failed to call the six government agents in the room to corroborate Ramirez's story. However, the government's response that it was prevented by the defense counsel from calling Agent Callanan, given their own failure to recall him during its chance for rebuttal, seems at best to have been a questionable response. However, after considering the entire record in this case, the fact that the remark was made only once during a six-day trial, and that the jury was instructed that closing arguments do not constitute evidence, we hold that the remark was harmless beyond a reasonable doubt since it would not have likely changed the result of the trial. *See United States ex rel. Shaw v. DeRobertis*, 755 F.2d 1279, at 1281–1282 (7th Cir.1985); *United States v. Castenada*, 555 F.2d 605, 610 (7th Cir.) *cert. denied*, 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977).

Even considering the effect of the improper statement, there was more than ample evidence in the record to establish Gonzalez's participation in the conspiracy and, thus, we are convinced that given the overwhelming evidence of guilt the jury would still have convicted him.[16] This was a con-

---

versible error because it was a blunt, explicit assertion of a fact that was not in evidence, and there was no possibility to consider it an invited response since it was made during the prosecutor's opening comments in his closing argument. *Id.* at 488–89. Our case is distinguishable on two points. In the case before this court, the prosecutor's remark did not explicitly refer to anything outside the record. More important, however, is the fact that the prosecutor's comments were in response to arguments set forth by defense counsel. In his closing argument, defense counsel, on two occasions, referred to the failure of the government to elicit testimony from any of the six agents present in the room concerning Ramirez's reporting to the agents the statements made by Gonzalez. The question then is whether the scope of the government's response was proper given the circumstances of the particular case.

15. Rule 801(d)(1)(B) of the Fed.R.Evid. provides for the admission of prior consistent statements to rebut a charge of recent fabrication:

"(d) Statements which are not hearsay. A statement is not hearsay if—

(1) Prior statement by [the] witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is...

(B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive...."

16. It is worth noting that the jury did not find Gonzalez guilty of two of the distribution charges for May 26th and May 31st. Certainly, this indicates that the jury gave him the benefit of the doubt whenever it could.

spiracy case and the government linked the defendant Gonzalez to the conspiracy to distribute narcotics.[17] Evidence was introduced establishing that on May 23, 1983, one week after the agreement was reached between Ramirez and Perez, Gonzalez flew from Miami to Chicago. Gonzalez checked into room 39 of the Diplomat Motel in Chicago. Ramirez came to the store on May 26th in order to pick up a cocaine sample; however, Perez told him to return between 5:30 and 6:00 p.m. since the sample was not ready. When Ramirez returned, it is undisputed that Gonzalez walked into the La Perlita store accompanied by his nephew, Manual Vargas, and Perez.[18] It was but a few minutes later that Perez gave Ramirez the requested cocaine sample. On May 31, at the conclusion of the meeting between Perez and Agent Menendez (who was posing as the buyer) setting the time and the place for the drug transaction, Perez stated to Menendez that he had to leave and meet with his connection in order to get things organized for the following day. Ramirez also testified that while giving Perez a ride back to the La Perlita store, Perez stated that he was going back to his "people" and inform them about the deal. Agent Williams, who was conducting surveillance, followed Perez and Ramirez to the La Perlita store. Williams testified that after Perez arrived at the store another car pulled up in front shortly thereafter with the driver of that car entering the store. Approximately one-half hour later, Agent Williams observed Perez and the driver leave. He followed them to Room 39 of the Diplomat Hotel, the room registered to the defendant Gonzalez.[19] The next day, on June 1, the exchange was made in a private hotel room in the Holiday Inn. Perez, Betencourt, and Gonzalez were present in the room and were arrested with two kilos of cocaine; the street value was estimated to be over one million dollars.

When viewing the totality of the evidence presented involving Gonzalez's participation in this conspiracy we agree with the district court's refusal to grant a new trial since we are convinced that there was overwhelming evidence as to Gonzalez's participation in the conspiracy to distribute cocaine such that a jury still would have found Gonzalez guilty beyond a reasonable doubt, regardless of the remark made by the prosecutor during its closing argument.

## IV.

The decision of the district court is AFFIRMED.

17. Gonzalez's defense in this case was to attack the credibility of Ramirez. He attacked Ramirez's credibility directly by concentrating on discrepancies in Ramirez's final report and the fact that Ramirez was paid on a commission basis. For example, Ramirez testified that Gonzalez had ordered Betencourt to retrieve the perico (slang for cocaine in Spanish), but in his final report of June 24, 1981, he stated that Gonzalez had ordered Betencourt to "go to the closet and bring me the bag." Gonzalez's counsel also tried to impeach Ramirez by showing alleged omissions in Agent Callanan's reports concerning the statements made by Gonzalez in the hotel room. The government objected to this questioning and the trial court sustained the objection as improper cross-examination. Gonzalez's counsel also attacked Ramirez's "15-page report [as] lacking sufficient detail, such as the fact that there was no reference to perico in that report, when considering the report's length."

The government rehabilitated Ramirez by demonstrating that the "15-page report" was in fact three full and two half-typed pages.

18. Ramirez testified that after Perez and Gonzalez entered the store, Perez went to a back room while Gonzalez waited in the front of the store and before Perez called Ramirez into the back room to exchange the cocaine sample, Gonzalez stared at him suspiciously.

19. It was stipulated at trial that the hotel room was registered to Gonzalez and that he was the registered occupant of the hotel room. Manual Vargas, the driver of the other car and the nephew of Gonzalez, was called by the government as a hostile witness. He stated that he brought Perez to his uncle's room so that Perez could deliver a bracelet to Gonzalez. He also testified that he thought of Gonzalez as his father.