**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Orlando ZAPATA, Defendant–Appellant.**

No. 88–1304.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1988.
Decided Feb. 24, 1989.

---

Rene A. Sotorrio, Law Office of Rene A. Sotorrio, Coconut Grove, Fla., for defendant-appellant.

Mel S. Johnson, Asst. U.S. Atty., Patricia J. Gorence, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before BAUER, Chief Judge, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

This is a direct appeal of a criminal conviction. After a jury trial, the defendant-appellant, Orlando Zapata, was found guilty of conspiracy to distribute cocaine, possession of cocaine with intent to distribute, and travel in interstate commerce to facilitate the illicit activity. *See* 21 U.S.C. §§ 841(a)(1), 846; 18 U.S.C. § 1952(a)(3). The district court sentenced the defendant to serve a total term of imprisonment of twenty years, followed by a special parole term of five years. It also imposed a $50,-000 fine as to the drug distribution charge, and a total special assessment of $150.

Mr. Zapata now submits that the district court committed reversible error in (1) admitting evidence of a prior uncharged drug transaction and instructing the jury thereon, (2) refusing to strike the direct testimony of a government witness after the witness invoked his fifth amendment privilege against self-incrimination during cross-examination, and (3) admitting evidence of hotel registrations. We affirm the defendant's conviction.

## I

### FACTS

In February 1987, Miguel Bilancieri, a Venezuelan student studying at the University of Wisconsin–Milwaukee, was arrested for the sale of eight ounces of cocaine. He reached an agreement with state and federal authorities under which all charges would be dropped in exchange for his complete cooperation in the investigations of other suspected drug traffickers and his promise to commit no further offenses. Gov't Ex. 1. Bilancieri did not keep his end of the bargain. On July 9, 1987, he was arrested by federal authorities for the sale of ten ounces of cocaine. A subsequent search of his apartment revealed nearly a half-kilogram of cocaine. After his arrest, finding himself facing four counts of drug trafficking, Bilancieri became more cooperative; he told federal agents in detail about a recently consummated transaction supplying him with two kilograms of cocaine. [Hereinafter referred to as the "June transaction."]. He named the defendant-appellant, Orlando Zapata, as his supplier.

Bilancieri told the agents (and later the jury) that, in early June, he had received a

phone call from a man named Milton, later identified as Mr. Zapata, seeking to arrange an eighteen- to twenty-thousand-dollar deal for "good quality product." Bilancieri understood this term to mean cocaine. Mr. Zapata gave Bilancieri several phone numbers in Miami and New York City at which he could be reached. Further phone calls occurred throughout the month, and eventually Mr. Zapata agreed to go to Milwaukee to discuss the terms of the drug sale. On June 27th, Mr. Zapata flew from Miami to Milwaukee and was picked up by Bilancieri at the airport. That afternoon, the two men negotiated and agreed to the sale of two kilograms of cocaine at a price of $19,000 per kilogram, which Bilancieri considered to be quite a bargain. Mr. Zapata also explained how the cocaine was to be delivered: the cocaine would originate in Miami, come through Chicago, and then be driven to Milwaukee by two couriers. That first night, Mr. Zapata stayed at Bilancieri's apartment, but he checked into the Milwaukee Hyatt Regency Hotel the following day.[1]

The couriers arrived on June 28th; Mr. Zapata introduced Bilancieri to them in the hotel lobby. Then, Bilancieri and the defendant drove to a nearby parking lot, the couriers parked beside them, and the couriers gave Bilancieri a two-kilogram box of cocaine. The next day, June 29th, Bilancieri drove Mr. Zapata to the airport. At that time, Bilancieri gave $19,000 to Mr. Zapata, and Mr. Zapata agreed to allow Bilancieri an extra week to raise the balance of the sum due. In parting, Mr. Zapata expressed a desire to conduct even more business with Bilancieri, stating that he supplied large quantities of cocaine to dealers in Miami and New York City, and that, if Bilancieri desired, he could supply greater quantities of cocaine to Milwaukee. Mr.

Zapata also told Bilancieri that, if Bilancieri wanted significant price discounts, he should arrange his own transportation for the cocaine. Specifically, Mr. Zapata suggested that Bilancieri furnish a car with Wisconsin license plates, which Mr. Zapata would then have modified with secret compartments for the clandestine shipping of drugs. After making such a farewell, Mr. Zapata returned to Miami.

Bilancieri now had two kilograms of cocaine, but also had a large problem—he had to get an additional $19,000 to complete his payment to Mr. Zapata. Several days following his return to Miami, Mr. Zapata called Bilancieri and communicated some concern about the remaining $19,000 that Bilancieri owed. Mr. Zapata recommended that Bilancieri fly down to Miami to address the matter, and Bilancieri complied. In Miami, Bilancieri met with the defendant; apparently, Bilancieri could not muster the funds required to cancel his debt,[2] and he returned to Milwaukee that evening. In order to raise funds, Bilancieri began to sell the two kilograms of cocaine he had purchased from Mr. Zapata. On July 9th, federal agents arrested Bilancieri for selling ten ounces of cocaine.

After recounting the above facts to the agents, Bilancieri and federal and state authorities reached a new cooperation agreement. Bilancieri agreed to assist in the seizure of at least six kilograms of cocaine and the indictment of the supplying individual. Gov't Ex. 2. Bilancieri began cooperating, and made several calls to Mr. Zapata that were recorded by FBI agents. Speaking in Spanish and employing code words suggested by Mr. Zapata on his prior visit,[3] Bilancieri and the defendant reached an understanding whereby Mr. Zapata would return to Milwaukee to transact a sale of seven kilograms of cocaine at a total price

---

**1.** Records from the Hyatt Regency Hotel in Milwaukee confirm that Mr. Zapata checked in and paid for a room for the night of June 28th.

**2.** The record does not reveal whether Bilancieri ever paid the additional $19,000 owed to Mr. Zapata. In Miami, Bilancieri sought to repay Mr. Zapata in part with a diamond-studded woman's Rolex watch allegedly worth $7500, but Mr. Zapata did not accept the watch in part-payment. As discussed further in the text,

this delinquency in Bilancieri's account apparently did not prevent Mr. Zapata from engaging in larger transactions with Bilancieri.

**3.** The code words included *"esmeralda"* (Spanish for "emerald") referring to a kilogram of cocaine, and "point," used in negotiations to refer to one-thousand-dollar increments in price.

of $140,000. Bilancieri succeeded in convincing Mr. Zapata that he had a client who would pay in cash for the entire amount. Mr. Zapata flew to Chicago with his driver/assistant Juan Palacio (an original co-defendant who testified for the government). Palacio had helped Mr. Zapata amass seven kilograms of cocaine and arrange for its transportation by automobile couriers to Chicago. After arriving in Chicago, they picked up the car fitted-out with secret compartments in which were stashed seven kilograms of cocaine and together drove to Milwaukee. Once in Milwaukee, Mr. Zapata checked into Room 910 at the Hyatt Regency and there spent the night of July 22nd.

Around noon the next day, Bilancieri was escorted by undercover FBI agents to the hotel, where he met Mr. Zapata and Palacio. Following a brief conversation, the men went to the hotel parking garage where the cocaine-laden vehicle was located. When they arrived at the car, Mr. Zapata told Palacio to open the hood. Then, while he remained outside and looked into the engine, Mr. Zapata instructed Palacio to "get it." Palacio went to the back seat of the vehicle, opened a concealed side panel and placed two yellow packets into a plastic bag Bilancieri had given him. At that moment, Mr. Zapata noticed a surveillance agent in the corner of the garage and barked out *"federales."* He then ordered Bilancieri and Palacio to get into the car with him. Bilancieri, however, refused to enter, telling Mr. Zapata that he had to report to his client about what was happening. Bilancieri returned to the hotel.

Mr. Zapata and Palacio also returned to the hotel soon afterwards, and subsequently were arrested in their room. A search of the vehicle at the hotel parking garage revealed, among other things, seven kilograms of cocaine secreted inside two concealed compartments located in the side panels.

## II

## ANALYSIS

### A. Other Acts Evidence

Mr. Zapata submits as his primary challenge on appeal that the district court erred in admitting evidence of Bilancieri's prior transaction with Mr. Zapata in June 1987. *See* Appellant's Br. at 11. In a related challenge, Mr. Zapata submits that the district court erred in instructing the jury on the consideration of the June transaction evidence. Our inquiry is governed by Federal Rule of Evidence 404(b). That Rule states that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

### 1. Admission of Evidence

This court has frequently discussed the relevant standard under which the district courts may permit the admission of evidence of acts other than those charged. *See, e.g., United States v. Leight,* 818 F.2d 1297 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 356, 98 L.Ed.2d 381 (1988); *United States v. Beasley,* 809 F.2d 1273 (7th Cir.1987); *United States v. Shackleford,* 738 F.2d 776 (7th Cir.1984). To determine if such evidence is admissible, the district court must engage in a four-pronged analysis and evaluate whether (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *See Shackleford,* 738 F.2d at 779 (prongs (1), (2), and (4)); *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988) (prong (3)). *See also United States v. Manganellis,* 864 F.2d 528, 531–532 (7th Cir.1988); *United States v. Rollins,* 862 F.2d 1282, 1294 (7th Cir.

1988). The overall, governing criterion of the analysis, however, is that there "must be a principled exercise of discretion" by the district court. *Beasley*, 809 F.2d at 1279. In reviewing decisions to admit evidence, we have stated that the district court's "[d]iscretion, when exercised, will rarely be disturbed," *id.*, and that we shall "reverse a decision of the trial court only for abuse of discretion." *United States v. Byrd*, 771 F.2d 215, 219 (7th Cir.1985).

■ Here, the district court did not abuse its discretion in admitting Bilancieri's testimony regarding the June transaction. In the parlance of Rule 404(b), the evidence was admissible for proof of "intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R. Evid. 404(b). Specifically, it shows Mr. Zapata's access to large quantities of cocaine, his ability to acquire distant customers, and the similarity between the *modus operandi* of temporally close transactions. It additionally goes to refute Mr. Zapata's theory of defense, which, according to his counsel, was that he "had nothing whatsoever to do with any cocaine transactions. Nothing. Not in [sic] June 28th and 29th, not on July 22nd and 23rd, not on any occasion." R. 102 at 77. Thus, the district court's decision to admit this evidence was not erroneous.

### 2. *Jury Instruction*

■ Over the defendant's objection, the court instructed the jury that:

You have heard evidence of acts of Defendant Zapata other than those charged in the indictment. You may consider this evidence only on the question of *predisposition*, intent, preparation, plan, knowledge, identity and absence of mistake or accident. This evidence is to be considered by you for this limited purpose.

R. 109 at 1329–30 (emphasis supplied). In its closing argument, the government also urged the jury to look at the evidence for this purpose, stating that "[i]t shows his predisposition." *Id.* at 1179. Such argument and instruction were erroneous.[4] This court has stated, and the government now concedes, that evidence of prior bad acts is not admissible to show a defendant's predisposition to commit the crime charged. *See United States v. Tomasian*, 784 F.2d 782, 784 (7th Cir.1986) ("Evidence of other crimes or wrongful acts of the defendant is inadmissible to show the defendant was predisposed to commit the crime alleged."); Fed.R.Evid. 404(b); Appellee's Br. at 22; *see also Shackleford*, 738 F.2d at 779 (evidence of other acts not admissible to show defendant's bad character, but may be in-

---

**4.** The district court jury instruction derives from Instruction 3.08 of the Federal Criminal Jury Instructions of the Seventh Circuit (1980 ed.), which antedates our recent holding in *United States v. Tomasian*, 784 F.2d 782, 784 (7th Cir.1986). The pattern instruction reads as follows:

    308  PROOF OF OTHER CRIMES OR ACTS
    You have heard evidence [*] of acts of the defendant other than those charged in the indictment. You may consider this evidence only on the question of _____.[**] This evidence is to be considered by you only for this limited purpose.
    Committee Comment
    This instruction may also be given during the trial at the time the evidence is introduced.

The district court substituted into the instruction the terms listed in the Committee Comment at **. This Comment is incorrect to the extent that it includes the term "predisposition." When the pattern instructions were proposed, the Judicial Council of the Seventh Circuit cautioned that:

As your Committee correctly points out, *we cannot and do not approve in advance the instructions given in any particular case.* Nevertheless, after careful consideration, we have unanimously approved these instructions *in principle* and authorize their publication for use in the Seventh Circuit.

Committee on Federal Criminal Jury Instructions of the Seventh Circuit, Federal Criminal Jury Instructions of the Seventh Circuit at v (emphasis supplied).

    [*] The trial judge may refer specifically to the evidence alluded to if necessary for clarity. Care should be taken, however, not to characterize the evidence or to give it additional weight.

    [**] *See* Federal Rule of Evidence 404(b). This evidence may be admissible for purposes such as proof of predisposition, motive, opportunity, intent, preparation, plan, knowledge, identity, presence, or absence of mistake or accident. This listing is not intended to include all possibilities. The court may find it necessary to modify the wording of this sentence to accommodate the particular purposes for which the evidence is admitted.

troduced "if it is directed toward something *other than* propensity") (emphasis supplied). Although the Rule 404(b) listing of permissible purposes for which evidence of other acts may be admitted is not exclusive,[5] the clear directive of *Tomasian* and the cautionary tone of Rule 404(b) [6] compel us to conclude that the jury instruction was erroneous.

Under Rule 52(a) of the Federal Rules of Criminal Procedure, however, any error "which does not affect substantial rights shall be disregarded," and designated "harmless." In considering whether a nonconstitutional error is harmless, "[o]ur task is to gauge 'what effect the error had or reasonably may be taken to have had upon the jury's decision.' " *Shackleford*, 738 F.2d at 783 (quoting *United States v. Shepherd*, 576 F.2d 719, 723 (7th Cir.) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946)), *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978)); *see also Manganellis*, 864 F.2d at 539; *United States v. Hudson*, 843 F.2d 1062, 1070 (7th Cir.1988). Only if we are convinced that the error did not influence the jury or had only a very slight effect, and can so say with fair assurance, should we hold the error as harmless. *Shackleford*, 738 F.2d at 783; *see also Beasley*, 809 F.2d at 1280 (error is harmless unless it results in actual prejudice or " 'had substantial and injurious effect or influence in determining the jury's verdict' " (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253 (1946))). When an error is found in a jury instruction, our inquiry is even more particularized in that we must look also at the instructions as a whole and determine "whether the instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *United States v. Jackson*, 569 F.2d 1003, 1010 (7th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978). Indeed,

> "[i]t is axiomatic that in determining the propriety of instructions they are to be viewed as a whole. As long as the instructions treat the issues fairly and adequately they will not be interfered with on appeal." *United States v. Patrick*, 542 F.2d 381, 389 (7th Cir.1976) (citations omitted), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); *United States v. Thibodeaux*, 758 F.2d 199, 202 (7th Cir.1985).

*United States v. Perlaza*, 818 F.2d 1354, 1358 (7th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987).

Here, an examination of the complete instruction, together with the other instructions, convinces us that the error was harmless. As was discussed *supra*, Part II.A.1., the evidence of Mr. Zapata's June transaction with Bilancieri was clearly admissible under Rule 404(b) to demonstrate Mr. Zapata's intent, plan, knowledge, and identity. *See* Fed.R.Evid. 404(b). The jury was correctly instructed to consider this evidence for these purposes. *See* R. 109 at 1329–30.

Our determination that the instruction on "predisposition" was harmless is bolstered by two further factors. First, a review of the trial transcript reveals only two mentions of the word "predisposition" during the entire nine-day trial. These oblique and passing references, especially when used in conjunction with correct instruc-

---

**5.** Commentators have remarked that "[t]he rule lists some of the instances in which other crimes evidence may be admissible, but these categories are neither exhaustive nor conclusive." J. Weinstein & M. Berger, *Weinstein's Evidence* § 404[08] at 404–57 (1988) (footnote omitted).

"Predisposition," however, appears to be an impermissible purpose. Although not an exact synonym for "the character of a person to show action in conformity therewith," predisposition seems close enough to be prohibited. Synonyms for predisposition include the terms "incli-

nation" and "susceptibility." Webster's Ninth New Collegiate Dictionary at 927 (1983 ed.).

**6.** The Advisory Committee stated that "[n]o mechanical solution is offered. The determination must be whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under [Federal] Rule [of Evidence] 403." Fed.R.Evid. 404(b) advisory committee's note.

tions on the use of this evidence, do not render, under the circumstances presented here, the district court's error reversible. *See Shepherd*, 576 F.2d at 723 (harmless error inquiry must not evaluate error alone, but rather, "in relation to all else that happened"). Second, the other evidence submitted by the government was, to put it mildly, "sufficient for the jury to have found each of the essential elements beyond a reasonable doubt." *United States v. Gruttadauro*, 818 F.2d 1323, 1329 (7th Cir.1987). Mr. Zapata was convicted for engaging in interstate drug trafficking on or about July 22 and 23, 1987. R. 100. The government's proof satisfactorily supports, and perhaps compels, a jury finding of guilt as to these violations, even without considering evidence regarding the June transaction. Regarding the July transaction with which Mr. Zapata was charged, Bilancieri and Palacio testified that Mr. Zapata travelled to Milwaukee to sell seven kilograms of cocaine. The defendant's negotiations with Bilancieri were confirmed by FBI recordings of their conversations. Mr. Zapata was observed leading Bilancieri to the hotel parking garage to consummate the transaction and then leaving after spotting FBI surveillance. Finally, nearly seven kilograms of cocaine were found inside the secret compartments of a car which Mr. Zapata drove to Milwaukee. In light of the strength of the government's case, the jury instruction's inclusion of the word "predisposition" was harmless.

## B. Cross–Examination

Mr. Zapata next submits that Palacio's repeated invocation of his fifth amendment privilege against self-incrimination on cross-examination infringed on the defendant's constitutional right to confront witnesses and thus denied him a fair trial. In light of Palacio's refusal to respond to questions posed by the defendant's attorney, Mr. Zapata argues that the district court should have stricken Palacio's entire direct testimony, including his statements about the vehicle and its secret compartments, and what he and Mr. Zapata did in Chicago prior to driving to Milwaukee. Mr. Zapata submits that the court's refusal

to strike substantially prejudiced him, and thus a mistrial should have been declared. *See United States v. Lyons*, 703 F.2d 815, 819 (5th Cir.1983).

The confrontation clause of the sixth amendment states that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." It serves a primary interest of protecting the right of cross-examination and face-to-face confrontation at trial. *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965); *see also Olden v. Kentucky*, —— U.S. ——, 109 S.Ct. 480, 102 L.Ed.2d 513 (1989); *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965); *Burns v. Clusen*, 798 F.2d 931, 936 (7th Cir.1986). The confrontation clause, however, generally only "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original). Sometimes, as in this case, the defendant's confrontation right may be restricted by a witness' invocation of his right against self-incrimination guaranteed by the fifth amendment. When such circumstances arise, the courts must watch vigilantly to ensure that the invocation did not " 'effectively ... emasculate the right of cross-examination itself.' " *Id.* at 19, 106 S.Ct. at 294 (quoting *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968)).

To prevent an emasculation of the confrontation right, a district court may consider it "necessary to strike the direct testimony" of a nonresponding witness. *Dunbar v. Harris*, 612 F.2d 690, 692 (2d Cir. 1979). "When a witness' refusal to answer prevents defendant from directly assailing the truth of the witness' testimony, the court should strike at least the relevant portion of the testimony." *United States v. Humphrey*, 696 F.2d 72, 75 (8th Cir. 1982), *cert. denied*, 459 U.S. 1222, 103 S.Ct.

1230, 75 L.Ed.2d 463 (1983). However, "[w]hen a witness refuses to answer questions based on fifth amendment privilege, striking the witness's *entire* testimony is an extreme sanction." *United States v. Lord*, 711 F.2d 887, 892 (9th Cir.1983) (emphasis supplied). As a corollary to the above principle, should the witness' refusal to answer "relate only to collateral matters, such as credibility, the danger to the defendant is considerably less and the witness' testimony may not need to be stricken." *Humphrey*, 696 F.2d at 75. Therefore, a court's resolution of this issue should focus on whether the unanswered questions involved matters directly related to the scope of the direct examination or to collateral matters. *See United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed. 2d 55 (1963) (stating that "[w]here the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness' testimony may be used against him"); *Monsoor v. Gagnon*, 497 F.2d 1126 (7th Cir.1974) (approving *Cardillo*); *United States v. Castello*, 830 F.2d 99, 101 (7th Cir.1987) (per curiam) (same). In determining whether the conflict between the defendant's confrontation right and the witness' privilege against self-incrimination should result in the striking of a witness' testimony or a declaration of mistrial, we recognize that the district court is in the best position to examine the particular circumstances of the case, and thus such decisions are committed to its discretion, and shall be reversed only upon a finding that the district court abused its discretion. *See United States v. Gullett*, 713 F.2d 1203, 1209 (6th Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984).

Here, Mr. Zapata submits that Palacio's refusal to respond on cross-examination not only infringed on his constitutional right to confront his accusers, but also deprived him of the ability to challenge Palacio's credibility and severely undercut his defense theory.[7] Appellant's Br. at 21. Palacio asserted his fifth amendment privilege regarding four general areas during the cross-examination: his prior activities in Chicago; his prior use of his Chicago apartment; his prior use of the car with secret compartments; and his previous cocaine trafficking.[8]

A thorough review of the record leads us to agree with the district court that the unanswered questions did not "concern the subject matter of his direct examination." *Castello*, 830 F.2d at 101. Thus, the district court did not err in determining that all these questions to which Palacio invoked his privilege against self-incrimination were collateral, and in refusing to strike Palacio's testimony. First, as noted above, matters of credibility are generally considered collateral. *See Humphrey*, 696 F.2d at 75. Additionally, however, Palacio's refusals to answer did not prevent the defendant from questioning his credibility. Indeed, not only did Mr. Zapata's counsel make such an argument to the jury, *see, e.g.*, R. 109 at 1220, but the government explicitly admitted that both Bilancieri and Palacio were drug dealers. *Id.* at 1187.[9] Second, all of the unanswered questions did not go to the exculpation of Mr. Zapata from the July transaction with which he was charged, but rather, were directed at Palacio's prior involvement in drug trafficking in Miami and Chicago. Third, the

---

7. Mr. Zapata's defense theory was that he was framed by Bilancieri and Palacio, this latter being the real leader of the drug distribution operation. Appellant's Br. at 20 n. 11.

8. Some of the specific areas of inquiry were:
   What he was doing in Chicago prior to July 22, 1987, that required him to use an automobile with concealed compartments, R. 105 at 617–18;
   Whether he already knew how to work the secret compartments because he had worked other secret compartments, R. 106 at 786–87;

Whether Palacio used the automobile with the concealed compartments in connection with his business in Chicago, R. 105 at 640;
   Whether he sells cocaine in Miami, *Id.* at 647.

9. In closing argument, the prosecutor stated that: "Well, they both are drug dealers. And I guess that's clear from their own admissions, clear from the evidence." R. 109 at 1187.

district judge reached his decision not to strike Palacio's testimony only after he considered several submitted briefs, R. 84, 85, 86, and engaged in an extended colloquy with trial counsel. R. 106 at 684–717. He was in a particularly advantageous position to evaluate the potential effect on the jury of Palacio's refusals to answer. Therefore, we hold that the district court did not abuse its discretion.

### C. Business Records

■ The appellant finally submits that the district court erred in admitting guest registration records of the Hyatt Regency on grounds that the records were inadmissible hearsay, since they were not filled out by employees, but rather, by the guests themselves. Appellant's Br. at 24. Rule 803(6) of the Federal Rules of Evidence provides that records of regularly conducted activity are not excluded by the hearsay rule, even though the declarant is unavailable as a witness. The rule defines "records of regularly conducted activity" as:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed.R.Evid. 803(6). With regard to the admission of such records evidence, this court has stated that:

The admissibility of business records is entrusted to the broad discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of that discretion. *Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir.1980). "Business records are reliable to the extent they are compiled consistently and conscientiously." *United States v. Ramsey*, 785 F.2d 184, 192 (7th Cir.1986).

*United States v. Peters*, 791 F.2d 1270, 1292 (7th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). The appellant challenges the hotel's registration book as unreliable because the information was provided by non-employees.

In applying the business records exception of the hearsay rule to hotel guest registrations, the inquiry is not controlled by the status of the recording person as a hotel employee or a guest. Rather, the key to satisfying Rule 803(6) in this context is whether an employee was "able in some way to verify the information provided— for example, by examining a credit card, driver's license, or other form of identification." *United States v. Lieberman*, 637 F.2d 95, 101 (2d Cir.1980). "[I]f such verification is obtained by the employee, we see no reason why the guest card that has been filled in by the guest himself would not qualify as a business record and thus be admissible for the truth of its statements." *Id.; see also United States v. Saint Prix*, 672 F.2d 1077, 1084 (2d Cir.) (hotel registration cards filled out by guests admitted when government showed sufficient corroboration of card information), *cert. denied*, 456 U.S. 992, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982).

Here, the executive assistant manager of the Hyatt Regency testified that it was the Hyatt's standard practice to verify the information provided.[10] In light of this evidence of the hotel's usual business procedure, *see Lieberman*, 637 F.2d at 101, and the independent evidence corroborating Mr. Zapata's June stay at the hotel, *see Saint Prix*, 672 F.2d at 1084, the requirements of

---

10. Mr. Rusty Macy testified that the "front desk clerk verifies the information, asks the information, to receive it from the guest and then fills out the information." R. 104 at 501. As to the Hyatt Regency's usual means of verification, he stated that "generally we solicit a business card or driver's license, a means of identifying that the person is who they [sic] say they are." *Id.*

Rule 803(6) were satisfied. Thus, we cannot say that the district court abused its discretion in admitting into evidence the Hyatt Regency's hotel records regarding the registration of Mr. Zapata as a guest on June 28 and 29, 1987.[11]

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment of conviction of Orlando Zapata.

AFFIRMED.

11. Again, the district court engaged in a detailed discussion with counsel regarding the admission of this evidence, R. 108 at 1047–57, and was assisted in reaching its determination by the submission of memoranda by counsel.