**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rocky SHUKITIS, Defendant–Appellant.**

**No. 88–2250.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1988.

Decided June 13, 1989.

As Amended June 15, 1989.

---

James Stanton, Merrillville, Ind., for plaintiff-appellee.

Gwenn R. Rinkenberger, Asst. U.S. Atty., Hammond, Ind., for defendant-appellant.

Before COFFEY, MANION and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Defendant-appellant Rocky Shukitis appeals from his jury conviction for knowingly and intentionally distributing approximately 13.7 grams of cocaine in violation of 21 U.S.C. § 841(a)(1). We affirm.

## I. FACTS

In January 1987, Robert Miller, an individual cooperating with the Lake County (Indiana) Police Department ("LCPD") to uncover drug trafficking activities in the Lake County area, informed LCPD officers that defendant Rocky Shukitis was distributing cocaine in the area and agreed to arrange a deal in which Detective Joseph Molina of LCPD would purchase cocaine from Shukitis. On January 15, 1987, Miller and Shukitis made arrangements for the sale of approximately one-half ounce of cocaine for a price of $1,250 and agreed that Shukitis would telephone Miller to confirm the deal the following day. When Shukitis telephoned Miller at his home on January 16, 1987, Molina was present. Miller told Shukitis that he was purchasing the cocaine for an individual named "Joe" —Detective Molina's alias. After discussing various locations to consummate the transaction, Shukitis and Miller agreed to meet at a Checker gas station located off Interstate 65 in Hobart, Indiana. Shukitis stated that he would be driving a blue van.

After Miller finalized the details of the cocaine purchase with the defendant Shukitis, Molina contacted LCPD detectives Raymundo Vasquez, Pam Laco and Vince Balbo and informed them where the deal would occur. The detectives thereafter assembled a surveillance team of LCPD officers, who positioned themselves at various points near the Checker gas station to observe the transaction between Miller, Molina and Shukitis. The detectives observed Shukitis and a woman later identified as his wife arrive at the gas station in a blue and white van where Shukitis exited the vehicle and walked into the station. Detective Vasquez entered the station and observed Shukitis standing in a hallway near the men's restroom.

A short time later, Miller and Molina arrived at the gas station[1] and observed Shukitis standing outside the men's restroom. Molina gave Miller $1,260 in cash, Miller exited the car and followed Shukitis into the restroom. Within two minutes, Miller returned to the car with ten dollars and a plastic bag containing a substance which Molina field tested for the presence of cocaine. Molina determined that the substance contained cocaine[2] and instructed Miller to inform Shukitis that the cocaine was "good." Miller spoke with Shukitis and left the station with Molina. The two drove to the LCPD Detective Bureau where Miller made a written statement to Molina and Balbo concerning his cocaine transaction with the defendant.

Shortly after Miller and Molina departed, Shukitis drove away from the gas station. Detective Vasquez followed Shukitis to the home of Phillip Arocho and observed the defendant park his van and enter the house. According to Arocho,[3] Shukitis con-

---

1. Before leaving Miller's house to drive to the Checker gas station, Molina searched Miller to ensure that he had no illegal drugs on his person. After determining that Miller was not in possession of narcotics, the two drove to the Checker station to meet Shukitis.

2. At trial, a forensic drug chemist testified that the bag contained approximately 13.7 grams of 86% pure cocaine.

3. Arocho testified at trial pursuant to the terms of a plea agreement. Federal Agents arrested Arocho on February 1, 1987, and seized four pounds of cocaine hidden in his garage. Arocho was charged with conspiracy to distribute cocaine and possession of cocaine with intent to distribute. Arocho pled guilty to these charges and was sentenced to five years' imprisonment. Under the terms of his plea agreement, Arocho agreed to cooperate in the government's investi-

tacted him in January 1987 stating that he wanted some cocaine. On January 16, 1987 —the day of the cocaine transaction at the Checker station—Shukitis drove to Arocho's house and picked up one-half ounce of cocaine. Shukitis returned approximately twenty minutes later and paid Arocho between $700 and $900.

Miller attempted to arrange a second cocaine transaction with Shukitis on January 26, 1987. On that date Miller, in the presence of Detective Molina, telephoned Shukitis and negotiated the sale of two ounces of cocaine at a price of $2,100 an ounce. Molina recorded this conversation on a portable cassette tape recorder. Molina also recorded further conversations between Miller and Shukitis on January 26, during which references were made to the sale at the Checker gas station. However, the sale did not occur on that date because Shukitis failed to obtain cocaine from his supplier. Negotiations continued on January 27, after Shukitis met his supplier and obtained one ounce of cocaine, which he proposed to sell to Miller for $2,200. Shukitis and Miller again engaged in several recorded telephone conversations, finally culminating in the two men agreeing to meet in the parking lot of an Eagle grocery store in Hobart. At this time Detective Molina notified Detectives Vasquez and Balbo, as well as Drug Enforcement Agents Michael Ehrsam and James Phenicie of the location of the proposed drug sale and instructed them to set up surveillance in the area.

According to Molina, after he and Miller arrived at the Eagle lot, Shukitis delayed following through with the sale because he suspected he was being watched. Although Molina offered Shukitis $2,200 to consummate the sale, Shukitis decided to change the location of the deal to a restaurant in Hobart and instructed Miller and Molina to meet him there. When Shukitis arrived at the restaurant, he was informed by two individuals apparently conducting surveillance for him that he was being followed and pointed to the car Vasquez was

driving. Shukitis refused to go through with the transaction and told Miller he would call him later that day to make other arrangements. Shukitis subsequently called Miller to discuss an alternative location for the deal. This discussion was also recorded on Molina's portable cassette recorder. Shukitis proposed that Miller meet him in a local tavern, but stated that he would not sell the cocaine in Molina's presence. Molina refused to deal with Shukitis in this manner; thus, the sale never took place and the surveillance terminated and the government decided to file drug charges.

On March 20, 1987, Shukitis was indicted in the Northern District of Indiana on one count of knowingly and intentionally distributing approximately 13.7 grams of cocaine in violation of 21 U.S.C. § 841(a)(1). Shukitis appeared with counsel and entered a plea of not guilty at arraignment.

A jury trial commenced on April 25, 1988, with the government introducing testimony of Philip Arocho, Detective Molina and the other members of the LCPD surveillance team, as well as a forensic drug chemist.[4] Arocho, testifying in accordance with the terms of his plea agreement,[5] stated that he had been distributing cocaine in the Lake County area for almost two years, profiting between $25,000 and $30,000 a month, and that his reputation as a cocaine dealer was well known. In addition to stating that he sold the defendant one-half ounce of cocaine on January 16, 1987, Arocho stated that he had sold cocaine to Shukitis on numerous occasions between 1985 and 1987. Although Arocho testified that he believed Shukitis purchased cocaine primarily for his own use, he admitted that Shukitis did not usually consume the cocaine in his presence. Arocho also stated that on at least one occasion he knew that Shukitis had sold the cocaine "to make some money...." Counsel for the defendant objected to Arocho's testimony arguing that it was evidence of other acts and thus, inadmissible under Fed.R.Evid.

gation and prosecution of cocaine traffickers in the Northern District of Indiana.

**4.** *See supra* note 2.

**5.** *See supra* note 3.

404(b). Defense counsel also filed a motion to strike Arocho's testimony alleging that its probative value was outweighed by its prejudicial effect. The trial court overruled the defendant's objections and denied the motion to strike on the grounds that the evidence of Shukitis' prior cocaine purchases established opportunity and intent and was therefore admissible under Rule 404(b).

Detective Molina testified regarding the cocaine sale at the Checker gas station on January 16, and the attempted sale in the Eagle lot on January 27. During Molina's testimony, the government offered the 14 tape-recorded telephone conversations occurring between Miller, Molina and Shukitis to be admitted into evidence. Prior to trial, the defendant filed a motion *in limine* objecting to testimony concerning Miller's and Molina's futile attempt to purchase cocaine from Shukitis on January 27. The defense also objected to the introduction of the recorded conversations as inadmissible hearsay based primarily on the fact that Robert Miller could not be questioned about the accuracy of the tape recordings because he was unavailable as a result of having committed suicide prior to trial. The trial court denied the defendant's motion and overruled his repeated objections to this evidence during the course of Molina's testimony.

On the second day of the trial the trial judge called the Assistant United States Attorney and defense counsel into his chambers and stated that he had been informed of violations of the court's separation of witnesses order. After some discussion it was agreed to call Detective Balbo, who had witnessed the alleged violations, into the judge's chambers and question him under oath as to the violation of the court's order. Balbo testified that William Shukitis, the defendant's father, was leaving the courtroom during the testimony of the government's witnesses and discussing the testimony with Elizabeth Shukitis, the defendant's wife, and her father, Frank Barragan, both of whom were prospective defense witnesses. Although the defendant was not present during Balbo's *in camera* testimony, defense counsel neither objected to his absence nor requested his presence at any time during the in-chambers conference. After listening to Balbo's testimony, the judge decided to conduct a full evidentiary hearing, outside the presence of the jury, on the matter.

During the course of this hearing, which was conducted in the presence of the defendant, the judge and the two attorneys questioned William Shukitis, Elizabeth Shukitis and Frank Barragan on their involvement in out-of-court discussions about the testimony of the government witnesses. After determining that each had engaged in conversations violating the court's separation order, the judge decided that the attorneys could examine these individuals about the violative conversations if they appeared as defense witnesses and concluded that a cautionary instruction to the jury was in order.

The judge informed the attorneys of his conclusions at a second in-chambers conference, which also proceeded without objection to the defendant's absence. During this conference the defense attorney stated that Shukitis had informed him that Detectives Molina and Vasquez were also in violation of the court's separation order. Another evidentiary hearing, conducted in Shukitis' presence, was held concerning his allegations against Molina and Vasquez. The court determined that the detectives had not engaged in out-of-court conversations in violation of the court's separation of witnesses order. The jury returned, and the trial proceeded.

On April 27, 1988, the case was submitted to the jury. After deliberating less than one hour, the jury returned a verdict of guilty. On June 24, 1988, the district court sentenced Shukitis to six years' imprisonment with a three-year term of supervised release to follow. Shukitis filed this appeal on July 1, 1988, alleging that: (1) the district court abused its discretion in admitting (a) the tape-recorded conversations referring to Miller's and Molina's failed attempts to purchase cocaine from Shukitis on January 26 and 27 because the government failed to lay a proper foundation for the tapes and also because the

tapes contained evidence of acts other than those charged in the indictment, and (b) evidence of Shukitis' previous cocaine purchases from Arocho; (2) the district court, in conducting the in-chambers conferences regarding alleged violations of the court's separation of witnesses order outside the presence of the defendant, violated his right under Fed.R.Crim.P. 43 and the sixth and fourteenth amendments to be present at all stages of his trial; and (3) the district court erred in failing to instruct the jury on entrapment.

## II. EVIDENTIARY ERRORS

Shukitis initially contends that the trial court committed reversible error in admitting tape recordings of telephone conversations occurring on January 26 and 27, 1988, and allowing Phillip Arocho to testify that he had sold cocaine to Shukitis on approximately ten occasions between 1985 and 1987. Specifically, Shukitis alleges that the government failed to lay a proper foundation for the tape recordings to be admitted and that in any case, the tape recordings, as well as Arocho's testimony, were inadmissible because they were evidence of acts other than those charged and were not admissible as exceptions under Fed.R.Evid. 404(b). At the outset we note that Shukitis' burden in challenging the evidentiary rulings of the trial court is a heavy one. As we stated in *United States v. Kaden*, 819 F.2d 813, 818 (7th Cir.1987): "[A] reviewing court gives special deference to the evidentiary rulings of the trial court. We shall only overrule such rulings on a showing that the trial court has abused its discretion."

### A.

■ Shukitis' initial allegation of error is that the government failed to establish a proper foundation for the district court to admit into evidence the tape recordings of telephone conversations regarding Miller's and Molina's attempt to consummate a second cocaine transaction with the defendant on January 26–27. This court, in *United States v. Zambrana*, 841 F.2d 1320, 1338 (7th Cir.1988), set out the standards governing the admissibility of tape-recorded conversations:

> "'Tape recordings are only admissible if the government can establish by clear and convincing evidence, that the recordings are "true, accurate and authentic recording[s] of the conversation[s], at given time[s], between the parties involved.'" *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985) (quoting *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir.1984)).

\* \* \* \* \* \*

> As we stated in *United States v. Faurote*, '[t]he trial judge's ruling on the admissibility of the tape will not be overturned on appeal absent "extraordinary circumstances."' 749 F.2d at 43. Moreover, because '[t]he trial judge [is] in the best position to weigh the credibility of the parties and the evidence presented,' *id.* at 44, 'the trial judge exercises broad discretion in determining whether [the government's] burden has been satisfied.' *Id.* at 43."

*Accord United States v. Vega*, 860 F.2d 779, 788 (7th Cir.1988).

The main thrust of Shukitis' challenge to the admission of the tapes is that because Molina, the government's sole foundation witness, was not a participant in the recorded conversations,[6] the government failed to establish that the tape recordings were true, accurate and authentic versions of the actual conversations between Miller and Shukitis. We disagree.

Our review of the trial transcript reveals that the government, through extensive foundational questioning of Molina prior to the district court's admission of the tapes into evidence, established that Molina was present during every recorded conversation

---

6. The defendant admits that Molina took part in two of the recorded conversations between Miller and Shukitis, but argues that he only participated in a portion of those two conversations. Thus, the defendant contends that the government could not lay a proper foundation through Molina for the introduction of the evidence because he did not fully participate in any of the tape-recorded conversations.

occurring between Miller and Shukitis. Molina testified that he used a portable cassette tape recorder—a device which he had used on five previous occasions—to record the conversations and that prior to attaching the recorder to the telephone, he tested it and determined that it was in working order. Furthermore, after recording the conversations, Molina listened to the tapes, identified the voices of Miller and Shukitis, as well as his own, and determined that they accurately reflected the conversations recorded on tape. Finally, there is little question that Molina was sufficiently familiar with the voices of Miller and Shukitis to authenticate the tape-recorded conversations. We recently set forth the standard of familiarity necessary for an authenticating witness to identify the voices of participants in conversations recorded on tape:

> "Federal Rule of Evidence 901(b)(5) ... permits voice identification of tape recordings to be made 'by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.' As long as the basic requirement of familiarity with the voice is met, lay opinion testimony is an acceptable means for establishing the speaker's identity."

*Vega*, 860 F.2d at 788. Molina's identification of Miller's and Shukitis' voices comports with this standard. Indeed, Molina had ample opportunity to familiarize himself with the recorded voices on the tapes. It is undisputed that Molina spoke with Miller on numerous occasions during the investigation of the defendant. In addition, the record establishes that Molina spoke with Shukitis on at least four occasions—twice over the telephone and twice in person when he attempted to purchase cocaine from the defendant on January 27, 1987. These facts, when considered in view of the broad discretion accorded trial court judges in ruling on the admissibility of tape recordings, *see Vega, supra,* convince us that the government, through Molina's testimony, established that the tape recordings were true, accurate and authentic recordings of the conversations between Miller and Shukitis. Thus, we hold that the government laid a proper foundation for the tape recordings to be admitted into evidence.

### B.

Shukitis also challenges the admission of the tape recordings, arguing that the tapes were inadmissible because the recorded conversations involved acts—namely, negotiations between Miller, Molina and Shukitis for a second cocaine transaction—which fall outside the parameters of Fed.R.Evid. 404(b). That rule, which governs the admission of "other acts" evidence, provides:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In this circuit, district courts, before admitting "other acts" evidence under Rule 404(b), must analyze the evidence within the framework of four-part test. Specifically, the district court must determine whether

> "(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*United States v. Zapata,* 871 F.2d 616, 620 (7th Cir.1989).

Here, the tape recordings revealed negotiations between Miller, Molina and Shukitis for a second sale of cocaine occurring within two weeks of the January 16 transaction at the Checker station—the transaction for which the defendant was indicted. During the course of these negotiations Shukitis acknowledged the sale at the Checker gas station and displayed a clear

intent to set up a second deal. Thus, the tapes were both relevant to and probative of the central issue at trial: whether Shukitis knowingly and intentionally distributed cocaine on January 16, 1987. Furthermore, Molina's testimony regarding his telephone conversations with Shukitis, as well as his testimony concerning his conversations with Shukitis in the Eagle parking lot on January 27, was sufficient for the jury to conclude that Shukitis had in fact engaged in the negotiations recorded on tape. Thus, we hold that the district court did not abuse its discretion in admitting the tape recordings of the telephone conversations between Shukitis, Miller and Molina into evidence.

### C.

 Shukitis' final challenge to the trial court's evidentiary rulings is also governed by Rule 404(b) and this court's four-part balancing test. *See Zapata, supra.* Specifically, Shukitis argues that the district court improperly admitted the testimony of Phillip Arocho, who stated that he had sold cocaine to the defendant on numerous occasions prior to January 1987. The defendant admits making these purchases from Arocho, but contends that because the purchases were for his own use, they were unrelated to the charge set forth in the indictment—distribution of cocaine—and served only to prejudice the jury against him. We disagree.

The evidence of Shukitis' prior cocaine purchases from Arocho, a well-known drug dealer in the Lake County area, was highly relevant and probative of Shukitis' intent and opportunity to obtain cocaine from Arocho, whether or not Shukitis obtained the cocaine for his own use or for resale. *See Zapata,* 871 F.2d at 621. Furthermore, Arocho also testified that Shukitis did not usually consume the cocaine in his presence and that Shukitis had on at least one occasion resold the cocaine he purchased from Arocho. Thus, Arocho's testimony was directly related to the count in the indictment charging the defendant with knowingly and intentionally distributing cocaine. Finally, the district court properly

instructed the jury that this evidence could be considered only for the limited purposes of determining the defendant's knowledge and intent. Because the defendant has presented no evidence to convince us otherwise, "[w]e make the crucial and valid assumption the jurors carefully follow instructions given them by the court." *United States v. Stern,* 858 F.2d 1241, 1250 (7th Cir.1988). Accordingly, we hold that the district court did not abuse its discretion in admitting evidence of Shukitis' previous cocaine purchases from Arocho.

### III. ABSENCE FROM IN–CHAMBERS CONFERENCES

Shukitis next contends that the district court violated his right to be present at all stages of the trial by conducting in-chambers conferences with the Assistant United States' Attorney and defense counsel concerning alleged violations of the court's separation of witnesses order. In particular, the defendant objects to his absence from the first of these conferences where Detective Vince Balbo testified under oath concerning conversations between Shukitis' wife, father and father-in-law which Balbo overheard.

 The defendant initially contends that the trial court violated his constitutional right to be present at all stages of his trial by conducting the in-chambers conferences in his absence. Although it is true that the right to be present at all stages of the criminal trial is recognized under the sixth and fourteenth amendments, *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486, 490 (1985), this right is not absolute. The constitutional right applies only to those proceedings where the defendant's "presence has a relationship, reasonably substantial, to his ... opportunity to defend against the charge." *Snyder v. Massachusetts,* 291 U.S. 97, 105–06, 54 S.Ct. 330, 332, 78 L.Ed. 674, 678 (1934). A defendant does not have the right to be present "when presence would be useless, or the benefit but a shadow." *Id.* at 106–07, 54 S.Ct. at 332, 78 L.Ed. at 678 (Cardozo, J.). "The court also cautioned in *Snyder* that the exclusion of a

defendant from a trial proceeding should be considered in light of the whole record." *Gagnon*, 470 U.S. at 526–27, 105 S.Ct. at 1484, 84 L.Ed.2d at 490 (citations omitted).

■ In this case, Shukitis' presence was not constitutionally required. The conferences, for the most part, involved only discussions on the proper course to pursue after the trial court was informed of alleged violations of its separation of witnesses order. The defendant's presence would not have aided the court in making such a determination. Furthermore, the defendant's attorney was present during all of these conferences. In any case, Shukitis' ability to defend against the charge of knowingly and intentionally distributing cocaine was in no way affected by his absence from these conferences. Indeed, when questioned on this matter at oral argument, Shukitis' attorney was unable to articulate, much less demonstrate how his absence from these conferences prejudiced his defense strategy. More importantly, our review of the record reveals that the trial court did not make its determination that the defendant's relatives had in fact violated the separation of witnesses order until *after* the judge held an evidentiary hearing in open court in the presence of the defendant. The testimony elicited at this hearing, *not* the conversations occurring at the in-chambers conferences, led to the judge's cautionary instruction—an instruction prepared by defense counsel—that the jury could consider the defense witnesses' violation of the court's separation order in assessing the witnesses' credibility. Thus, we hold that the defendant did not have a constitutional right to be present at the in-chambers conferences because his presence was not required to ensure "a reasonable opportunity ... to defend against the charge." *See Snyder, supra.*

■ The defendant attempts to sidestep this holding by arguing that he also had a right to be present under Fed.R.Crim.P. 43, which has been recognized as a broader right than that recognized under the Constitution. *See Gagnon, supra.* We need not determine whether Rule 43 entitled the

defendant to be present at these conferences, however, because the defendant has waived this argument on appeal. In *Gagnon*, the Supreme Court stated:

"If a defendant is entitled under Rule 43 to attend certain 'stages of the trial' which do not take place in open court, the defendant or his counsel must assert that right at the time; they may not claim it for the first time on appeal from the sentence entered on a jury's verdict of 'guilty.'"

470 U.S. at 529, 105 S.Ct. at 1486, 84 L.Ed. 2d at 492. At oral argument defense counsel admitted that he neither requested that the defendant be present nor objected to his absence during any of the in-chambers conferences concerning the separation of witnesses order. Furthermore, our review of the record reveals no post-trial motion bringing this issue to the attention of the trial judge. Thus, the defendant is asserting his Rule 43 right for the first time on appeal, which *Gagnon* prohibits. As a result, we hold that the defendant has waived his argument based on Rule 43.

## IV. REFUSAL TO INSTRUCT THE JURY ON ENTRAPMENT

■ Shukitis' final contention is that the district court erred in refusing to tender his proposed jury instruction on entrapment. Shukitis argues that as a result of the court's failure to instruct the jury on entrapment, he was denied a fair trial.

In *United States v. Douglas*, 818 F.2d 1317, 1320–21 (7th Cir.1987), this court held that a defendant is entitled to an instruction on a particular theory of defense if he satisfies the following four-part test: "The defendant proposes a correct statement of the law; the defendant's theory is supported by the evidence; the defendant's theory of defense is not part of the charge; and the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial." After reviewing the record, it is clear that Shukitis has failed to satisfy the second prong of the *Douglas* test. That is, the evidence does not support the defendant's entrapment theory.

In order to raise the entrapment defense, "a defendant must produce evidence of both the Government's inducement and his own lack of predisposition." *United States v. Perez–Leon,* 757 F.2d 866, 871 (7th Cir.), *cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985) (citations omitted). The defendant argues that because he introduced evidence establishing that the government, through Miller, initiated the cocaine transaction and that Shukitis was reluctant and ultimately refused to go through with the proposed transaction on January 27, he successfully raised the entrapment defense and was therefore entitled to have the jury instructed on this theory. We disagree. In *Perez–Leon* we stated:

"Predisposition 'refers to whether the defendant had a readiness or willingness to commit the offense charged, or whether the government "implant[ed] in the mind of an innocent person" the disposition to commit the offense.' *United States v. Fields,* 689 F.2d 122, 124 (7th Cir.), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982) (*citing Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932)). The factors relevant in determining the predisposition of the defendant are: (1) assessing the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of criminal activity was made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant expressed reluctance to commit the offense which was overcome only by repeated government inducement or persuasion; and (5) the nature of the inducement or persuasion applied by the government. *United States v. Kaminski,* 703 F.2d 1004, 1008 (7th Cir.1983). As the court recognized in *Kaminski,* none of these factors, when considered by themselves, are determinative; however, the most important factor is whether the defendant evidenced a reluctance to engage in the criminal activity that was overcome only repeated government inducement. *Id.*"

757 F.2d at 871. Our review of the record convinces us that Shukitis was ready and willing to sell cocaine to Miller and that this willingness was not the result of repeated government inducement.

It is undisputed that Miller initially contacted Shukitis to set up the cocaine transactions. However, it is well established that "mere solicitation by itself by a government agent is not sufficient to establish the entrapment defense." *Id.* at 872. *Accord United States v. Gunter,* 741 F.2d 151, 154 (7th Cir.1984); *United States v. Perry,* 478 F.2d 1276, 1278 (7th Cir.), *cert. denied,* 414 U.S. 1005, 94 S.Ct. 363, 38 L.Ed.2d 241 (1973). Moreover, the defendant's argument that he was reluctant to engage in the transaction with Miller finds no support in the record. With respect to the transaction on January 16, Detective Molina testified that after Miller initially proposed the cocaine deal to Shukitis, the defendant returned Miller's phone call, informed him that he would sell Miller one-half ounce of cocaine for $1,250 and instructed Miller and Molina to meet him at the Checker station in Hobart. Regarding the attempted transaction on January 27, the only reluctance Shukitis exhibited was to deal with Molina after Shukitis' surveillance operations informed him that he was being followed by the car Detective Vasquez was driving. Indeed, the tapes of the recorded telephone conversations reveal that after Shukitis refused to consummate the sale in the restaurant parking lot, he called Miller and offered to deal exclusively with him:

"MILLER: Hello.

SHUKITIS: Yeah.

MILLER: Hey.

SHUKITIS: Hey, what's hap?

MILLER: Not much.

SHUKITIS: I hope nothing is going down, you know.

MILLER: No, that. . . .

SHUKITIS: Man, I seen that grey car following me, my boys called me, you know on my radio.

MILLER: Uh, huh.

SHUKITIS: You know you got to be cool bro', we can't be no business. . . .

MILLER: Oh, you know that.

SHUKITIS: It's gotta be me and you now man.

MILLER: Yeah.

SHUKITIS: I don't want to see that dude, if he don't want it I'll take it somewhere else."

After Miller informed Molina of Shukitis' proposed deal, Molina and Shukitis engaged in the following conversation:

"MOLINA: You don't want to deal, who is this with the car man, I ain't....

SHUKITIS: I don't know, well you don't need to know that, that's from both of my friends.

MOLINA: I'm not, I'm not getting ripped off man.

\* \* \* \* \* \*

SHUKITIS: Well, yeah, hey you got to have a little trust dude. You give Bob [Miller] that money he can meet me down the street, things are cool, I'll give it to him, come back to you and be happy.

MOLINA: And I come out light again.

SHUKITIS: You ain't going to come out light. These guys don't mess around, they ain't like no boys around here, you know.

MOLINA: Huh?

SHUKITIS: These boys don't play like around here.

MOLINA: They don't play around here?

SHUKITIS: You know like living here like poor boys.

MOLINA: I don't know those guys in the car and they don't know me, they're saying that I'm a narc, I don't even know them, how, they might be narcs.

SHUKITIS: I know them too, but they don't know, you know, they're a lot of talk. I don't live around here, that's why I don't do business around here. I don't want to meet nobody.

MOLINA: I don't live around here either.

SHUKITIS: Okay, well why don't you just give Bob the money he can meet me down the street, bring it back to you in two minutes and you be happy and I'll be happy, if you ain't happy I'll get a hold of you.

\* \* \* \* \* \*

MOLINA: Well, how's this going to work, when we get into some heavy quantity here.

SHUKITIS: Well, we'll talk about that later, you know, things were working good let's keep it this way. You want to keep going we will, you don't we don't."

Shukitis' eagerness to continue dealing with Miller and Molina is obviously demonstrated in the above-referred-to excerpts from the tapes of the recorded conversations. Thus, we conclude that the defendant's argument that Shukitis was a reluctant participant in both the January 16 sale and the January 27 attempted sale finds no support in the record. On the contrary, there was more than sufficient evidence to establish that Shukitis was predisposed to distribute cocaine. Thus, we agree with the district court and hold that the trial judge's refusal to instruct the jury on entrapment was proper.

## V. CONCLUSION

The defendant's arguments in favor of reversing his conviction are without merit. The trial court properly admitted the tape recordings, as well as Shukitis' prior cocaine purchases, into evidence. Further, the defendant was not constitutionally required to be present at the in-chambers conferences concerning the violations of the court's separation of witnesses order and waived any right to be present at such conferences he may have had under Fed.R. Crim.P. 43. Finally, the district court properly refused to instruct the jury on entrapment. Such an instruction was clearly without support in the record. The judgment of the district court is

AFFIRMED.